By proper indictment, the defendant was charged with the murder of Alfonzo Price, and thereupon at the January Criminal Term, 1942, of the Superior Court of Wayne County was convicted of murder in the first degree and sentenced to death.
The proceedings on the trial pertinent to this appeal may be summarized as follows:
Mrs. Gladys Price, widow of Alfonzo Price, testified that she lived about five miles from Goldsboro on the lands of Mrs. Thomas O'Berry, and had been living there with her husband and children for five years. The home is located on the east side of the Dudley Road, facing west.
She was at home on the night of 24 November, 1941, with her husband, who was then forty-six years old.
Witness had known Walter Smith for about four years. He came to the home on 24 November about 1:30 o'clock, carrying a shotgun, and stated that he was going rabbit hunting. Witness and a Mr. Holland were working on a brooder house. Smith called to Mr. Holland and said, "I am going rabbit hunting. I like rabbit." He came to the brooder house and sat down and kept talking about rabbit hunting, saying he liked rabbit and was going to kill him a rabbit.
Mr. Holland asked Smith if his gun was loaded, and Smith said, "Yes, his damn gun stayed loaded." He left after awhile, going down the road and entering his house. *Page 281 
Witness did not see him any more until he came to the Price house on the night of the homicide. At that time, witness was sitting with her husband near the fireplace, putting Ammonia-mercury on his sore hand. Smith hailed from the outside, and witness recognized his voice. Her little girl went to the door and Smith asked if her father was at home, and she told him "Yes." When the father had been told that Smith wanted to see him, he sent the little girl back and asked Smith to come in, which Smith declined to do, saying that he did not have time — just wanted to speak to Price.
Witness' husband then walked out into the yard, when Smith began to curse him and tell him that he had come to kill him; that he had "took every damn thing off him that he ever intended to take off him."
Witness immediately got up to go to the porch where they were, and she was in a step of the porch when the gun fired. When she came into view, her husband was standing at the corner of the porch, and Smith was standing about two steps off.
When Smith told her husband he was going to kill him, Price said to him, "Mr. Smith, please don't kill me." He said, "Please don't shoot me." Smith replied that he had come to kill him and that he wasn't going to take anything else off him. I stepped out on the porch and asked what was the trouble, and her husband told witness, "He shot my leg off." Smith was standing right where he shot him. He then backed off about three steps, blew the powder out of his gun and reloaded it.
Price was standing with his back toward Smith, holding his hands up, saying nothing. Witness went back into the house to get a lamp and when she returned, Smith was behind the oak tree. He stepped out from behind the tree, turned his gun upon witness, and told her not to come out, that it was nothing concerning her. Her husband was hollering and went on hollering. Smith turned his gun upon Price and told him not to holler again, that he would shoot his damn brains out. Price staggered from the porch to the tree, hopped or staggered. Witness could not tell how, since his leg was "shot clean off." The tree was nine or ten feet from the porch. Witness carried the lamp and set it down, and by the time she got it on the ground, her husband was leaning against the tree, standing on one leg, holding his hands up.
Her husband was beginning to fall, and fell over the tree roots. She reached to assist him, but Mr. Smith walked around the tree, threw the gun on her and told her not to put her hands on him. She told Smith not to tell her what to do, that she was doing everything she could for her husband, and asked him to please go home. He stood there a few moments, turned around and went down the road towards home.
Witness got something to cord the leg with and while doing so, found that it was shot off about the knee, about four or five inches below the *Page 282 
knee. "The front of his leg was just holding his foot. My husband had bled to death by the time Mr. Smith left there."
Witness stated that it looked like a bucket full of blood had been taken and poured around the tree where her husband was shot, and that he did not bleed any after he had fallen down. The blood extended from one-fourth to one-third around the tree where he staggered. Smith stayed about five minutes after he fired the gun. He was smoking a pipe at the time he shot him, and continued to smoke when he drew the gun on him the last time.
Smith appeared like he always had. He walked straight on down towards home, holding his gun to his side. He walked normally.
Witness stated that her four youngest children, herself and her husband were at home when Smith first came, but that after the father was shot, all four of the children left home, running back through the house to the next house, where the oldest daughter lived. She called to the children to come back and help as she tried to cord the leg. The oldest daughter came and the children went after Mr. Jones and Mr. Holland to tell them to come at once. Several of the neighbors came in a short while. By the time Holland got there, they had picked up Price and put him on the front porch, and when Mr. Holland came, they put him in the back seat of the car and carried him to the hospital at Goldsboro. "My husband died. I think he was dead before we put him in the car."
Previous to this time, Price was in good health; he was overseer at the O'Berry farm, and rented directly from Mr. O'Berry.
Witness knew of no dispute between Mr. Smith and her husband, except that one day Smith came by and told Price that he wanted help to dig potatoes — a mule and wagon and a man. Price told him he was sorry but he did not have anybody but himself, Bernice Jones and witness. He had to send barley to town by his son, and told Smith that as soon as the boy came back with the wagon, he would have the boy help to dig the potatoes. After Price got the barley off, Smith turned and said, "Well, I have done told you," and left.
After Smith left, Price told Bernice and his wife to go and help him, and they went where Mr. Smith was digging potatoes, and he said that he had help enough, such as witness was. Price then went across the field to help him. Mr. Smith told witness that he was not going to have anything else to do with her husband; that he had never been to him lately for accommodation but that he snapped him up.
Her husband's wound was examined by a doctor at the hospital, and the doctor pronounced him dead.
Witness then described the home and location of windows, porch and tree in the yard, and illustrated the location of various objects by the use of a diagram, to which she referred, and testified as to the accuracy of this diagram. *Page 283 
The defendant made sundry objections to the use of the diagram and the various references which the witness made thereto. These objections were overruled, and defendant excepted.
Mrs. J. S. Holland, witness for the State, testified, in substance, that she had known both Smith and Price and lived in the same vicinity; that she was sent for and went to the home of Mr. Price on 24 November, about 2:00 o'clock. On the way back in the afternoon, she stopped at the Smith house and saw Smith, who was sitting in the kitchen with his wife. Smith told witness it was a damn good thing she had come, because he was just about to wring the old woman's neck. After a little talk, Smith said, "I want you to look at the sun." He asked his wife what time it was, and she said it was 20 minutes past 4, and Smith said, "Well, in less than a year I will be electrocuted." Witness said, "Mr. Smith, you don't know what you are talking about," and he said, "Yes, I do." About five o'clock Smith came out and went to the barn for some corn to feed his hogs. He said, "I am going to feed these hogs the last damn time I ever intend to feed them." Witness saw Smith again the night of the homicide about six o'clock. He was with witness' husband on a car and conversed quite a bit. Witness thought he had had a drink. After he had shot Price, Smith came back and called Holland, witness' husband, and witness went to the door. Smith wanted Holland, and said, "I have shot Mr. Price and I want to see Mr. Holland." Said he had shot Price in the foot or leg, or somewhere, and added, "I should have shot him in the stomach or in the head; I should have shot him six months ago." Smith said, "I ought to have shot the black livered s. o. b. a long time ago." Smith wanted Holland to take him to town, but Holland declined, saying, "No, I am going to take Alfonzo, if you shot him, he needs help," and Mr. Smith said, "Well, I will walk."
Witness said that she went to get somebody to take Smith to town. When she got to the Price home, she saw blood at the tree, blood on the porch and doorsteps, blood everywhere he had bled, and where they had laid him on the porch, doorsteps and at the tree. Blood was around the roots of the tree on the side next to the house.
The last time she saw Smith at her home, she thought he was drinking a little.
J. S. Holland, witness for the State, testified that on 24 November, Smith came by Price's home, where witness was building a brooder, carrying a gun, stating that he liked rabbits and would like to have a young rabbit. Asked if his gun was loaded, he replied, "Yes, he never toted an unloaded gun." Witness said Smith looked like he may have had a drink or a nap, his eyes were red, but did not think he was under the influence of intoxicating beverage. *Page 284 
After witness had taken Smith home, he next saw him after the latter had shot Price — about eight o'clock. Smith came and called for witness. The Price children had come before that and told witness what had been done. When invited in, Smith said that he did not have time, that he had shot Mr. Price, "a black livered s. o. b. I ought to have killed him six months ago, and I want you to take me to town where I can get a doctor," and witness replied, "No, if you have shot Price, I will go to him first." Then Smith said, "Well, I will go on," and went toward town walking.
Witness told his wife to go to Mr. Mozingo's and tell Roy to take Smith to town and witness would take Alfonzo.
When witness got to Price's home, he was on the front porch, unconscious — there was much blood, some on the doorsteps and some on the porch, and all around the roots of the tree on the side next to the porch. He carried Price to the hospital. After the doctor had observed the body, it was taken to the funeral home. Witness left him at the hospital.
Smith had come to the Holland home on the preceding Sunday morning, driving his mule and buggy. Holland had borrowed some knives to butcher hogs with, and had two butcher knives and did not know whose they were, whether Mozingo's or Smith's. Mrs. Holland brought these knives out, and Smith said, "You will have to take the mule. I would not even attempt to meet a woman with two butcher knives." He appeared to have had a drink, but was not drunk. The knives were put in the buggy, and Smith insisted on Holland going home with him. On this occasion, Smith said that he would not be a free man by Christmas. Witness replied, "Mr. Walter, you don't know what you are talking about. You must have had one drink too many," and Smith said, "No, watch what I tell you, and see if I am not telling the truth." Smith told Holland that he would like to go to town with him Monday morning, and when Holland stopped by Monday morning, he found Smith feeding hogs; but finding that Mr. Price was going to town with Holland, Smith declined to go.
William Crumpler, a witness for the State, testified that on 24 November, he was living with the witness Holland on Mr. Thomas O'Berry's farm; that he saw Smith between Price's house and Smith's own home. Smith had a shotgun, and stopped. Witness asked, "Where in the world have you started with that shotgun?" and Smith replied, "I have started rabbit hunting, bird hunting, squirrel hunting, anything that I see to shoot, I am going to kill." Smith then asked who was at Mr. Price's, and was told that Mr. Holland was up there working on a brooder house, and Smith went on toward Price's. Witness saw Smith later feeding hogs and noticed some corn lying outside of the pen, and witness said to him, "Here is some corn you are wasting, lying out here in the road," *Page 285 
and witness threw it into the pasture. Smith replied, "I don't care, I don't expect to feed the damn hogs any more anyhow." Witness saw Smith no more that day, but that night he heard the children hollering and saying, "Papa was shot"; so witness went to the house. When he got there they had laid Mr. Price on the porch and all around it looked like you had butchered two or three hogs, around the tree roots. Price was lying on the front porch.
On cross-examination, the witness stated that he had not got close enough to tell whether Smith was drunk; that Smith had drunk occasionally, and once in awhile would get under the influence. When he had seen him under the influence of whiskey, witness was just passing the road and Smith was hollering at his mule. He was drinking pretty heavy the way he acted.
Lena Mae Price, daughter of Alfonzo Price, testified that she was living with her father and mother at the date of the homicide, but was at the home of Bernice Jones. She went home upon being informed that her father was shot, and then went after Mr. Holland. While she was at the latter place, Smith came up and stated that he had shot Price and wanted Holland to take him to town. "He was cursing my father when he was there. Said he should have killed him six months ago and called him a black livered s. o. b."
When Smith asked Holland to take him to town and Holland had told him he would deal with him later, witness got in the car and went home.
When Holland arrived at the Price home, witness' father was lying on the front porch. They put him in the car and took him to the hospital. "There was blood on the roots of the tree towards the porch, and blood on the edge of the porch and on the doorsteps." Witness did not know of any previous trouble between them.
Isaac Jones, a witness for the State, testified that he lived on the O'Berry farm, and that about the middle of November, he heard Walter Smith say he was not going to have any more dealings with Mr. Price, because he felt like if he did there would be trouble. Witness stated on cross-examination that he had seen Smith when he was drinking — "in bad shape lots of times."
A. P. Precise, a deputy sheriff, witness for the State, testified as to finding Smith standing in the road, both hands up, with his hat in one hand, asking if witness would carry him to the sheriff's office. Precise asked Smith what reason he had for shooting Price, and Smith replied that he "shot him because he wanted to." On cross-examination, witness stated that Smith talked all right, except that he acted a little nervous. "I think Mr. Smith had had a drink; I think he was sober."
After witness brought Smith to town, he went back to the Smith home and found the gun, loaded, in the bedroom behind the door. It was a *Page 286 
single barrel shotgun, twelve gauge. Witness found an empty shell where the shooting took place.
Witness corroborated Mrs. Price as to the position of the parties when her husband was shot.
Carl Motley testified that he was a licensed embalmer, and had been for seventeen years, having taken a regular, prescribed course in embalming and attending an embalming school for one year. The court held that he was an expert embalmer. This witness proceeded to testify that Alfonzo Price had been brought to his funeral home; that he examined the body and prepared it for burial, and made an examination of it. It was covered with blood, and he had to clean it up before it was put in a casket. The witness stated that he had observed the wound and that it looked like he had been shot at close range, "the leg was broken and the skin was holding it. There was a lot of blood on it."
In his testimony, the witness stated that he had studied "the blood track of the human body," which was necessary to his profession; that he was not a physician and had never studied medicine.
Over the objection of the defendant, he was permitted to say that he had an opinion satisfactory to himself as to the cause of the death of Price; that the arteries were torn in two and there were no major arteries left there at all. He stated that, in his opinion, the deceased had bled to death from the wound in the leg. Exception was made to this testimony.
J. A. Whitley, deputy sheriff and witness for the State, testified that he saw the defendant at the jailhouse after having been brought there in the custody of A. P. Precise, deputy sheriff; that he had been informed of the homicide, but at the time did not know that Price was dead. That Smith freely and voluntarily proceeded to tell him about it. Whitley said, "Walter, what in the world is the matter," and Smith replied, "I shot a man." Smith got out and came in the jail. He stated to the witness that he shot Price and said he ought to have killed him six months ago; that he had started to shoot him right in the face, but did not, but said he wished he had. Witness said, "What in the world did you shoot him for?" and Smith stated that Price had borrowed some harness from him and had returned it in bad shape. He stated that "when Price came out, it made him so mad he could not help but shoot him." He asked that the sheriff be called so he might give bond. Witness stated that he could tell Smith had been drinking some, but that he would not call him a drunk man. That was between 8:30 and 9:00 o'clock. On cross-examination, he repeated that Smith had been drinking, but that he would not call him a drunk man. He walked all right and he talked all right.
Dr. H. D. Rose, a witness for the State, was qualified as a practicing physician, and gave his opinion, upon the hypothetical question embodying *Page 287 
the principal features of the evidence, that Price had died as a result of a gunshot wound in the leg.
The shotgun, empty shell and shell found in the gun in the home of the defendant, having been identified, were offered in evidence and admitted, over the objection of the defendant.
Recalled, Mrs. Price testified that Smith had told her that he had shot Price's leg off and to get a doctor and he would pay the expense. That was right after he had shot him.
Roy Precise, witness for the State, corroborated the testimony of Mrs. Price as to the particulars of the shooting. This witness used the same diagram in explanation of his further testimony that was used by Mrs. Price, to the accuracy of which he testified.
The record discloses that the diagram was offered for the purpose of illustrating and explaining the testimony of the witnesses, Roy Precise, Mrs. Price, and A. P. Precise. To the testimony referring to the diagram and to the introduction of the diagram, the defendant objected.
At the end of the State's evidence, the defendant offering none, the defendant moved for judgment as of nonsuit, which motion was overruled and defendant excepted.
Pertinent parts of the judge's charge to which exceptions are made are noted in the opinion.
Formal motions are made to the refusal to set aside the verdict of the jury and for a new trial and to the judgment as signed.
The defendant appealed, assigning errors, which preserved his exceptions.
The defendant's appeal challenges many features of the trial which resulted in his conviction of murder in the first degree and a sentence of death. All of the exceptions have been carefully considered. We discuss only those we think merit attention in a written opinion.
Exceptions were taken to the use in evidence of a diagram of the premises where the homicide occurred, drawn with reference to the main features of that happening, particularly the position of witnesses, actors in the scene, and objects mentioned in the testimony. The objection raised was upon the ground that the diagram was not made by the testifying witnesses and that the jury was not instructed at the time that it was used only to illustrate or explain the testimony. As to the latter contention, the record discloses that it was formally offered only for that purpose — a fact of which counsel seem to be inadvertent. As to the other *Page 288 
contention, the correctness of the diagram was attested by the witnesses using it, and this we deem to be sufficient for its admission, and use as the record shows to have been done in the case at bar. Tankard v. R. R.,117 N.C. 558, 23 S.E. 86; Arrowood v. R. R., 126 N.C. 629,36 S.E. 151; S. v. Harrison, 145 N.C. 408, 59 S.E. 867; S. v. Rogers,168 N.C. 112, 83 S.E. 161; S. v. White, 171 N.C. 785, 87 S.E. 984; S. v.Spencer, 176 N.C. 709, 97 S.E. 155; S. v. Kee, 186 N.C. 473,119 S.E. 893; Walters v. State, 23 Ala. App. 434; People v. Shearer,133 Cal. 154, 65 P. 295; People v. Schultz, 197 N.Y. S., 888.
Exception was made to the admission in evidence of the statement of Carl Motley that the deceased had bled to death from the wound in the leg. Motley was a licensed embalmer, who prepared the body for burial shortly after death.
The court held that Motley was an expert embalmer. He testified, substantially, that while he was not a physician and had never studied medicine, he had studied the "blood track of the human body," which was necessary to the profession of embalming. He described the condition of the body, stating that it was covered with blood; that the leg was broken "and the skin was holding it," and that there was a lot of blood on it. He testified that the arteries were cut in two, and that there were no major arteries left there at all. He was then permitted to say that, in his opinion, the man had bled to death as the result of the wound in his leg. The statement was near the category of a shorthand statement of an observed fact.
There was expert medical testimony to the same effect; and Mrs. Price testified, without objection, that her husband had bled to death before defendant left, and that he was dead when put into the car to be carried to Goldsboro.
The court may be justified in inferring that a physician, graduate of a reputable medical college, licensed, and for some time employed in practice, has the requisite amount of experience and is, therefore, qualified to give an opinion; and, ordinarily, where expert testimony is relied upon to show the cause of the death, men learned or skilled in the medical profession are called upon for an opinion. But we apprehend that the real test of the admissibility of such evidence, or rather the competency of the witness from whom it comes, does not rest upon the fact that he belongs to a certain profession to which opinion evidence of that character is necessarily confined, but upon a principle that must lie behind the competency of all opinion testimony — the fact that the witness has special experience in matters of the kind, and his conclusions may, therefore, be helpful to the less experienced jury.
The qualification of a witness to give an opinion as one skilled, or, as it is usually termed, an expert, depends on matters of fact and the question *Page 289 
is addressed to the trial judge, with opportunity to the objector to test the experience of the witness by appropriate examination. Regardless of the professional label, it is for the court to say whether the witness is qualified to testify as one skilled in the matter at issue, and his finding will not be disturbed when there is evidence to support it, and the discretion has not been abused. S. v. Brewer, 202 N.C. 187,162 S.E. 363, 81 A.L.R., 1424; Turner v. American Security Tr. Co.,213 U.S. 257, 23 L.Ed., 788.
To what extent the experience of a professional embalmer, with a knowledge of the blood vessels of the human body and their functions, and with ocular evidence that they had been emptied of their life-sustaining content, might qualify him to testify that the deceased had bled to death through the severed arteries, we do not need to say. We are inclined to the opinion that the court might not infer such experience merely from the fact that he was an expert embalmer, but in this case we do not feel that it is necessary to pass upon that point.
We have the impression that there was never any serious controversy as to the manner in which Price came to his death, and are of opinion that upon the record, the pertinent exceptions do not disclose prejudicial or reversible error. S. v. Inscore, 219 N.C. 759.
The instructions to the jury embodied in the judge's charge are assailed in two respects.
In the course of his charge, the judge — with apparent inadvertence — instructed the jury as follows: ". . . Murder is the unlawful killing of a human being with malice aforethought. That is murder in the first degree."
This is the approved definition of murder prior to the enactment of C. S., 4200, dividing murder into first and second degrees, and providing that murder committed with premeditation and deliberation, etc., shall be murder in the first degree and punished with death, and "all other murder" shall be murder in the second degree and punished by imprisonment in the State's Prison.
The statute intended to select out of all murders denounced under the above definition those that were more heinous because committed with premeditation and deliberation, or in the perpetration or attempted perpetration of a felony, etc., as murder in the first degree, punishable with death, and leave other murders deemed less heinous as murder in the second degree, punished by imprisonment. S. v. Cole, 132 N.C. 1069, 1074, and 1075, 44 S.E. 391.
The defendant insists that the word "aforethought" used in this definition is not synonymous with "premeditated" and "deliberate," which is essential to first degree murder, and that it merely means "intentional," citing S. v. Cole, supra. As pointed out by the Attorney-General, *Page 290 
"aforethought" is defined as "premeditated" (Century, Webster), and "premeditated" is defined as "deliberate."
In S. v. Cole, supra, the Court, in sustaining the statutory form of indictment, C. S., 4614, has this to say, per Justice Connor: "Whatever difference of opinion may have existed in regard to construction of Laws 1893, chapter 85, before or at the time of the decision of Fuller's Case
[S. v. Fuller, 114 N.C. 885], it is now conceded that by the statute, the crime of murder in the second degree is as at common law, which is defined to be `when a person of sound memory and discretion unlawfully killeth any reasonable creature in being and under the King's peace with malice aforethought, either express or implied.' Blk. Com., star p. 195."
It is clear, then, that the word "aforethought" cannot be held to import into the definition the element of premeditation or deliberation. Indeed, it is rather definitely indicated that it relates rather to the prior existence of the malice which motivates the murder than to a previously entertained purpose. Standing alone, it is inadequate to convey to the jury the necessity of finding premeditation and deliberation as an element of first degree murder.
The crime of murder in the first degree is distinguished by a mental process or psychological condition, none too easy of expression. S. v.Cole, supra, at pp. 1078, 1079. But where the content of words has been determined with more exactness by legal usage and stabilized by approved formula, they are to be understood and applied in this sense.
Subject to the reservation that there is no phase of the evidence which supports the theory of manslaughter, it was necessary that the jury have an understanding of the features which distinguish the three kinds of unlawful homicide: Manslaughter is the unlawful killing of another upon sudden passion, under legal provocation, without malice and without premeditation and deliberation; murder in the second degree is the unlawful killing of another with malice and without premeditation and deliberation, and is presumed from an intentional killing with a deadly weapon; murder in the first degree is the unlawful killing of another with malice and with premeditation and deliberation — or in the perpetration or attempt to perpetrate a felony.
The expression to which objection is made does not stand alone, and we feel that these distinctions were sufficiently made clear. The trial judge repeatedly instructed the jury that they could not find the defendant guilty of murder in the first degree without finding from the evidence, beyond a reasonable doubt, that the killing was done with premeditation and deliberation. This was accompanied with ample explanation and illustration, and the law was carefully applied to pertinent phases of the evidence, of which the record, unfortunately, is full. With due regard to the character and importance of this case, we feel that duty *Page 291 
requires us here, as in other similar cases, to apply the rule that the charge must be examined contextually and viewed as a whole to determine whether it is so prejudicial as to be condemned for reversible error. Having done so, we do not find that in this particular it justifies reversal. S. v. Shepherd, 220 N.C. 377; Motor Co. v. Ins. Co., 220 N.C. 168;S. v. Cash, 219 N.C. 818, 15 S.E.2d 277; S. v. Moore, 197 N.C. 196,197, 148 S.E. 29.
There was some evidence in the case tending to show that the defendant had been drinking some time prior to the homicide — none that he was drunk. But counsel stress the importance of defendant's condition at the time, as tending to show that by reason of drunkenness, he was incapable of forming or entertaining the deliberate purpose to kill. Specific objection is made because the jury was instructed that "intoxication cannot serve as an excuse for the offender" and that "intoxication, though voluntary, is to be considered by the jury in a prosecution for murder in the first degree, in which a premeditated design to cause death is essential, with reference to its effect upon the ability of the accused at the time to form and entertain such design, not because per se it either excuses or mitigates the crime, but because in connection with other facts, an absence of malice or premeditation may appear"; and further, because the jury was instructed "if it is shown that an offender charged with such crime is so drunk that he is utterly unable to form or entertain this essential purpose, he should not be convicted of murder in the first degree."
The instructions gave to the defendant all to which he was entitled, and perhaps more, since it is doubtful whether the evidence was sufficient to raise the question at all. It has been said that while this defense requires no separate plea, nevertheless, in some way it should be brought to the attention of the court that the defendant relies upon it. S. v.Cureton, infra. Doubtless, as a matter of precaution it was presented to the jury by the court ex mero motu.
Without taking up these exceptions in detail, we think it sufficient to refer to the very full discussion on the subject in the recent case of S.v. Cureton, 218 N.C. 491, 11 S.E.2d 469, in which similar objections were made and resolved against the defendant. Upon all the challenged features, the charge in the instant case very closely follows the law as laid down in this case. From the copious citations of authority from this State contained in the cited case, the historical development of the law may be followed. It may be that the rules applicable to drunkenness as a defense against crime in some of their aspects reflect the public policy rather than philosophical refinement, but they were correctly applied in the case at bar.
Exception is made to the instruction given the jury with respect to the burden resting upon the defendant in seeking to mitigate the offense from *Page 292 
murder in the second degree, a presumption of which arises out of intentional killing with a deadly weapon, to manslaughter. While we think the challenge to the instruction cannot be maintained upon principle, still, as we see it, there was no phase of the evidence available to the defendant upon which manslaughter might be predicated, and any instruction with regard to it was harmless. Apparently, the manslaughter view was presented as a matter of grace and not of necessity. At any rate, where the distinction was of moment, the court correctly charged that the presumption of malice and of murder in the second degree arises from intentional killing with a deadly weapon.
We do not mean to dismiss the objections presented to us as mere technicalities. That term is not infrequently applied to the honest and meticulous effort of the courts to apply the law, without judicial amendment, giving to the affected party its full benefit, even to the shade of a shadow. Where there is a doubt that this has been done, the vigilance of counsel makes for higher standards of trial. But our duty carries us beyond the mere detecting of isolated inaccuracies into a review of their possibilities or probable effect on the result. The defendant, we believe, has had a fair trial, without prejudicial error in the aspects covered by the exceptions.
The motion for judgment as of nonsuit was properly overruled.
We find
No error.