STATE OF NORTH CAROLINA v. DAVID EARL HOWARD AND JOE
HOWARD

No. 4

(Filed 23 August 1968)

**1. Criminal Law § 104— nonsuit at close of State's evidence — consideration of evidence**

Where one defendant moves for nonsuit at the close of the State's case, he is entitled to have his motion of nonsuit considered solely upon the State's evidence and without reference to the testimony and evidence of his co-defendant.

**2. Criminal Law § 104— nonsuit in consolidated action at close of all evidence**

Where each defendant in a consolidated action offers evidence, the court must consider all the evidence in the case in passing upon their motions for nonsuit; thus, each defendant's motion must be finally considered — not only in the light of the State's evidence — but in the light of that offered by his codefendant.

**3. Homicide § 21— homicide perpetrated in course of robbery — nonsuit**

In this consolidated prosecution of two defendants for first degree murder arising out of the perpetration of a robbery, there is sufficient evidence to be submitted to the jury on the issue of the guilt of each defendant.

**4. Homicide § 15; Criminal Law § 50— cause of death — opinion of nonmedical witness**

The opinion of a nonmedical witness as to the cause of death in a homicide prosecution is admissible (1) if the witness is qualified by experience and observation to give an opinion, and if (2) the facts to be interpreted are not of such a nature as to render valueless any opinion but that of an expert in a particular field.

**5. Homicide § 15; Criminal Law § 50— cause of death — opinion of nonmedical witness**

Where the testimony of medical experts is not accessible in a homicide prosecution to explain the fatal character of the wounds, a nonexpert who saw the wounds upon the body of the deceased may describe them to the jury; if his training and experience convince the court that he is qualified to do so, he may express an opinion as to whether the wounds caused the death unless they are of such a nature as to render valueless any opinion except that of an expert.

**6. Homicide § 15— evidence of cause of death — opinion of coroner — mortician**

Testimony of a coroner is competent as an expression of opinion on the cause of death in a homicide prosecution where (1) the witness graduated from a college of mortuary science, has been a licensed mortician for over thirty years, has attended seminars in medical schools and coroner's schools, and has examined approximately a thousand questionable deaths

in the last twenty years, and where (2) the evidence clearly reveals that the deceased had died from visible head injuries.

**7. Homicide § 25— instructions on proximate cause — contention that judge "assumed" facts to be proven**

The trial court in a homicide prosecution clearly instructed the jury that in order to convict either defendant of murder the State must satisfy the jury beyond a reasonable doubt either that the particular defendant had inflicted injuries on the deceased which proximately resulted in his death or that the injuries had been inflicted by the other pursuant to a conspiracy between the two defendants to rob the victim; consequently, there is no merit in defendant's contention that the portion of the charge excepted to, which portion was taken out of context, might be interpreted as an assumption by the trial judge that one or both of the defendants fractured the skull of the deceased and that the fracture caused his death.

**8. Criminal Law § 111— instructions — prejudicial inquiry by court**

Defendant is not prejudiced by trial judge's inquiry to counsel at the end of the charge if there was "anything further gentlemen," the defendant contending that counsel were compelled to answer "no" and thereby causing the jury to assume there was no error in the charge, although it is better practice for the court to make such inquiry of counsel out of the hearing of the jury.

**9. Criminal Law § 119— requested instructions**

Even if a defendant is entitled to requested instructions, the court is not required to give them verbatim, it being sufficient if they are given in substance.

**10. Homicide § 25— requested instructions — defendant's duty to aid victim**

Where the court instructs the jury that mere presence at the scene of the crime would place no legal obligation on either of the defendants to take overt action or come to the rescue of the deceased, it is not error for the court to refuse to give separate requested instructions thereon.

**11. Homicide § 25— requested instructions**

It is not error for the court to refuse to give verbatim requested instructions that if the jury believes all of the facts in the case to be as testified to by the defendant then it shall be their duty to return a verdict of not guilty, where the substance of the requested instruction was implicit in the entire charge.

**12. Searches and Seizures § 1— Fourth Amendment guarantees — seizure of "mere evidence"**

The Fourth Amendment to the United States Constitution secures the same protection of privacy whether the search is for "mere evidence" or for fruits or instrumentalities of the crime or for contraband; there must be, however, a nexus between the item to be seized and criminal behavior.

**13. Searches and Seizures § 1—   necessity for warrant — article in plain view**

Neither the Fourth Amendment nor G.S. 15-27 is applicable where no search is made; the law does not prohibit a seizure without a warrant by an officer in the discharge of his official duties where the article seized is in plain view.

**14. Searches and Seizures § 1—   seizure without warrant — limits of reasonableness**

The limits of reasonableness which are placed upon searches are equally applicable to seizures, and whether a search or seizure is reasonable is to be determined on the facts of the individual case.

**15. Searches and Seizures § 1;   Criminal Law § 84—   seizure without warrant of defendant's bloody shirt — reasonableness of seizure — admissibility of shirt**

In a prosecution for murder in the first degree, a deputy sheriff's seizure of defendant's bloody shirt worn on the day of the homicide was reasonable and the shirt was properly admitted into evidence where (1) the deputy who was acting pursuant to orders from his principal, the sheriff, had probable cause to believe that the defendant had murdered the victim, (2) the shirt was in plain view in the defendant's room, the door to which was open, (3) the deputy entered the room, not for the purpose of making a general search for evidence of guilt, but in search of defendant himself, and (4) the deputy took the shirt with probable cause to believe it would prove to be evidence of defendant's guilt.

**16. Homicide § 29—   instruction on right of jury to recommend life imprisonment**

In a consolidated prosecution of two defendants for murder in the first degree, it is proper for the trial court, despite the solicitor's initial announcement that he was not asking for an unqualified verdict of first degree murder, to instruct the jury that they might return one of four verdicts as to each defendant: (1) guilty of murder in the first degree, (2) guilty of murder in the first degree accompanied by a recommendation of life imprisonment, (3) guilty of murder in the second degree, or (4) not guilty.

APPEAL by defendants from *Peel, J.,* December 1967 Session of BEAUFORT.

Each defendant was tried upon a bill of indictment which charged that on 5 November 1967 he "did unlawfully, wilfully, and feloniously kill and murder Major Wright Lewis." Upon his affidavit of indigency the court appointed L. H. Ross, attorney, to represent defendant David Earl Howard (David Earl), and Junius D. Grimes, attorney, to represent Joe Howard (Joe). Without objection, the two cases were consolidated for trial.

Before the selection of the jury was begun, the solicitor announced that he would not ask the jury for an unqualified verdict of murder

in the first degree (which would carry the death penalty), but — as to each defendant — he "would seek a verdict of guilty as charged with a recommendation of life imprisonment" or such other lesser verdict as the evidence might justify in each case. Each prospective juror, however, was sworn and examined separately on *voir dire* in accordance with the practice in capital cases.

The evidence for the State tended to show: Late Sunday afternoon, 5 November 1967, the two defendants, David Earl and Joe, along with Blossom Moore and Margaret Williams, were at Skeeter's place in Washington. The four had been drinking. David Earl gave Joe a dollar to take the group to Brown's place on Highway No. 17. There they encountered Major Wright Lewis (Lewis), who had also been drinking. For seventy-five cents Lewis bought the two defendants and himself a drink. He paid for it with a $5.00- or $10.00-bill and put the change in his shirt pocket. After about thirty minutes, the three men left Brown's place with Blossom and Margaret and went to Dody's place, a short distance away on Gray Road. Joe parked his car, a black 1955 Ford, by an oak tree in front of a vacant parsonage about 150 feet from Dody's place. The two girls got out of the automobile and went into Dody's place, leaving the men at the car. David Earl said that he was coming in, but he never did. As Margaret got out of the car, "Joe Howard hunched David Earl and said if this man had any money he was going to get it." She did not hear David Earl say anything.

Between 6:00 and 7:00 on that Sunday evening ("It was approaching dark."), Melvin Tripp, who lived across Gray Road from the parsonage, went to his car, which he had parked "on the parsonage side," with a man whom he was taking to the hospital. He "heard leaves scuffling" and saw David Earl standing beside a black 1955 or 1956 Ford 6-7 feet from his car. David Earl, whom Tripp had known for about 14 years, said, "Don't come over here or I'll shoot." To Tripp's question, "What's wrong with you, man?" David Earl made no reply. Tripp saw in front of the Ford a pair of shoes, "toes pointing skyward," and pants, "filled out like they had something in them . . . pants legs up to about midway the calf." Nothing else was said, and Tripp drove away. He saw no one else out there at that time. When he returned home that night between 10:00 and 11:00 p.m., he parked his car at the same place and went straight into his house.

After having "danced and messed around in" Dody's place about an hour and a half, Blossom and Margaret came out. They met David Earl, who said he had started in after them. At the car, one of the

girls asked where Lewis was, and Joe said he had gone. As they were driving off, Joe hit a car parked in front of Dody's place. "The slam" brought ten to twenty people out of Dody's. Joe said that he was going to call a patrolman. He told the two girls and David Earl to wait until the officer came, but they left in another car before he arrived.

The following day, Monday, 6 November 1967, between noon and 1:00 p.m., Melvin Tripp went to his car. He observed a hat about 10 feet away; then he saw the body of a man lying face down beside the parsonage. He immediately notified the sheriff. When he returned to the scene the sheriff was there.

Deputy Sheriff Sheppard, who arrived at the scene about 1:20 p.m., found the body of Major Wright Lewis lying face down between the parsonage and a stack of cinder blocks supporting an oil drum. The body was "in that depression from the eaves drip" about eighteen inches from the building. Thirty-six feet from the body was a pool of blood "approximately eighteen inches across." The leaves had been disturbed on a line between this pool and the body. Located toward the deceased's feet was a row of cinder blocks, two of which had been knocked out of line. At the deceased's head was a cinder block on which there was a "dark red substance which was dry."

Bonner Paul, who has been Coroner of Beaufort County for the past twenty years and a licensed mortician for over thirty years, came to the scene with Sheriff Harris about 1:40 p.m. In Lewis' pockets they found only matches and a half pack of cigarettes. The left side of his face was badly distorted and pulpy; air was under the tissues, which were loose from the skull. On the right temple, over the right ear, were two lacerations. In an area approximately three inches in diameter, the skull was fractured in two different places. There were no other lacerations, abrasions or bruises on the body. From the jugular vein Paul removed two vials of blood. In his opinion, Lewis' death resulted from lacerations of the brain caused by a fractured skull.

That afternoon, after he had visited the scene, viewed the body, and talked to Tripp, Sheriff Harris directed Deputy Sheriff Davis to find David Earl and bring him to the sheriff's office. Davis did not find him at his place of employment when he went there at 3:40 p.m. About 4:00 p.m., he went to David Earl's rooming house. Davis had no warrant of any kind. He inquired of David Earl's landlady if he was in his room. She said she did not know and asked the officer to accompany her upstairs to see. They found the door of David Earl's

room open. The entire room, however, was not visible from the hall. Before entering, Davis saw a shirt, which appeared to have blood on it, lying on the bed "in plain view." When he went inside, he immediately saw that David Earl was not in the room. Davis made no search; he merely picked up the shirt and carried it away with him. He took nothing else.

About 4:30 that afternoon, David Earl surrendered himself, and a warrant charging him with the murder of Lewis was sworn out about 5:00 or 5:30 p.m. Davis talked to him at the sheriff's office.

When the solicitor offered in evidence the conversation between Davis and David Earl, the judge excused the jury and inquired into the circumstances under which the statements were made. On *voir dire*, Davis said that he gave defendant the following warning: "You have the right to remain silent and not make any statement. Anything you say can and will be used against you in court. You have the right to talk to a lawyer for advice before any questions have been asked, have him present or anyone else during your questioning. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions. If you decide to answer questions now without a lawyer present, you have the right to stop any time answering those questions. Do you understand each of these rights I have explained to you?" When David Earl said that he did understand, Davis said, "Having these rights in mind, do you wish to talk to us now?" David Earl replied that he did wish to talk. After cross-examining Davis, Mr. Ross, attorney for David Earl, said, "We have no objection to his (Davis') testimony." The record shows that "neither defendant desired to present evidence on the *voir dire*." At the conclusion of the evidence, Judge Peel found as a fact that David Earl had been fully advised of his constitutional rights and that the statements he made to the sheriff were freely and voluntarily made without fear or compulsion.

The jury then returned, and Davis testified as follows: David Earl said that he, Joe, Blossom, and Margaret went to Dody's place Sunday evening, the 5th of November, in order to dance. He saw a white man, whom he did not know, lying on the ground. The man appeared to have been beaten up. He got within three feet of the man, but he did not touch him.

At that point in his conversation with David Earl at the sheriff's office, Davis said he produced the shirt which he had taken earlier from David Earl's room. At this point in his testimony at the trial, Davis also produced the shirt, which was then marked State's Exhibit 9, and used it to illustrate his testimony.

Continuing his testimony before the jury with reference to his conversations with David Earl, Davis said he asked him if the shirt (Exhibit 9) belonged to him. After examining it carefully, David Earl said that the shirt was his and that he had worn it the night before. When Davis pointed out to him the spots on the shirt, David Earl said that he knew nothing about them. (The foregoing testimony with reference to the shirt and its use by Davis to illustrate his testimony before the jury was without objection from either defendant.)

On the night of 6 November, about 7:30, Davis found Joe in an automobile "with a whole lot of folks" at a country store.

Before permitting Davis to testify as to the conversations he had with Joe, the court conducted a *voir dire* during which Davis testified that he had given Joe the identical warning which he had earlier given David Earl. After hearing the evidence on *voir dire* as to the warnings given Joe, Judge Peel found that he had been fully advised of his constitutional rights and that the statements which he made were "freely and voluntarily made without fear or compulsion."

After Davis had explained his rights to Joe and given him the required warning, Joe said that he fully understood what had been said to him and that he wished to talk to the officers because he had not done anything. He then accompanied Davis to the sheriff's office, where he said that he, David Earl, Blossom, Margaret, and "the white man" went to Dody's from Brown's place.

When Joe told Davis that Lewis went with David Earl and the two girls to Dody's, he did not question him further at that time; he had another talk with David Earl. This time David Earl told Davis that he, Joe, Blossom, Margaret, and "the white man" rode together from Brown's place to Dody's in Joe's black Ford; that after parking the car there, the three men got out of the front seat and walked around to the front of the vehicle, where Joe knocked Lewis down, using only his fist "as far as he knew"; that David Earl then pulled Lewis a short distance away from the front of the automobile.

When David Earl made the preceding statement the officers called in Joe, and David Earl repeated it in Joe's presence. Joe said that the statement "was a lie." In the presence of David Earl, Joe then told the officers that Blossom, Margaret, David Earl, he and Major Wright Lewis left Brown's place and went to Dody's; that they parked near Dody's and Blossom and Margaret went in; that Lewis and David Earl got out on the right side of the car, and David Earl knocked Lewis down and stomped him; that Joe remained in the car and observed proceedings through the right front

window of the car. When Joe made that statement David Earl said, "Its a lie," and there was no further conversation.

Two or three days after this confrontation by defendants, Joe sent word to Sheriff Harris that he wanted to see him. In consequence, Joe was brought to the sheriff's office, where he said that he "wanted to make a statement." He told Sheriff Harris that "he didn't want to take or be punished for something he didn't do"; that he didn't get out of the car the night that Major Wright Lewis was beat up; that David Earl was the one who knocked him down and beat him up and was stomping and kicking him; that the car window was partly down and he said, "Hey, boy, boy, what you doing? What do you mean there? What are you doing that for?"; that he never put his hands on Lewis; and that he never got out of the car until he had the wreck.

When Sheriff Harris asked Joe if he would be willing to make that statement in the presence of David Earl, he said that he would. David Earl was brought in from the jail and informed that Joe had made a statement which the sheriff wanted him to hear. Joe repeated the statement. David Earl said that it wasn't true; that he didn't touch Lewis except to pull him from in front of the car; and "that Joe took him and drug him over beside the building."

In response to the sheriff's question whether he received or took any money from Lewis, Joe said that "David Earl gave him a dollar . , . . that night out there, after David Earl had beat up Major Wright Lewis." David Earl said he didn't give him a dollar.

(Each time Deputy Sheriff Davis or Sheriff Harris testified as to a statement made to him by one of the defendants, Judge Peel instructed the jury that the statement was admitted only as against the defendant making it, and it was not to be considered against the other.)

On Tuesday morning, 7 November, about 10:00, Lewis' 23-year-old son went to the place where his father's body was found. There he found, "on the ground around a bunch of leaves," his father's empty billfold, which he took to the sheriff.

The vial of blood which the coroner removed from the neck of Lewis was typed in the crime laboratory of the State Bureau of Investigation at Raleigh and found to be in Group O. The laboratory also analyzed the spots on the shirt (Exhibit 9), which Davis removed from the room of David Earl. These spots were found to be human blood in Group O.

At the conclusion of the State's evidence both defendants' mo-

tions for nonsuit were overruled. Each defendant elected to offer evidence and to testify in his own behalf after the judge had explained to him that he did not have to take the stand. Each defendant told the judge that his attorney had explained that to him "and the other things involved," and that he desired to testify.

Joe Howard's testimony tended to show: About 5.00 p.m. on 5 November 1967 he met Blossom, Margaret, and David Earl at "a joint" in Washington; that David Earl asked him to drive them to Brown's place on Highway No. 17 and said he would pay him. Joe took them there; he had no money. They found Lewis at Brown's place. He bought Joe a small drink, the last of Brown's liquor, and Lewis suggested that they go elsewhere for more whiskey. In Joe's car, the five went to Dody's place, a trip of 3-4 minutes. The men rode in the front seat of the two-door car; the girls, in the back. Joe parked in front of an old house about 150 feet from Dody's. After Lewis and David Earl got out, Joe held the seat back for the two girls. They got out and disappeared. Joe did not nudge David Earl nor did he say anything to him whatever. He remained in his car working on his signal lights. Hearing a struggle and scuffling in the leaves, he looked up to see David Earl hitting Lewis, who fell down. David Earl then kicked and stomped him. No words were spoken, and Lewis made no outcry. Joe asked David Earl what was wrong with him but received no reply. A stranger came up behind the car and said something to David Earl, who made some reply. Joe, however, was unable to understand what either said. Lewis was on the ground at the time. After the person drove away, David Earl dragged Lewis from in front of the car and laid him down between the house and an old oil drum. When he returned Joe told him he was going to leave. They had been there only about 10-15 minutes. David Earl went for the girls and met them returning to the car. When they asked where Lewis was, Joe pointed to him and said he was "around there." They looked and said nothing.

Joe never said anything to David Earl about taking any money off Lewis, and he did not move his car or get out of it until the girls came back. He never touched Lewis, and, although he knew he was hurt, he made no investigation to see how badly David Earl had hurt him.

After the girls got in the car, in attempting to leave, Joe hit Felton Smith's car. Smith came out and Joe told him, the girls, and David Earl that he was going to call a patrolman. David Earl gave him a dollar for bringing them down there and then left the scene with the girls. At 7:30 p.m. a patrolman came and stayed about 20

minutes. He gave Joe a ticket "for failing to see that an intended move could be made in safety." Joe did not tell the patrolman that Lewis was lying over by the cinder blocks.

Joe is 47 years old. He has been convicted of an assault with a deadly weapon, hit and run, driving drunk, disorderly conduct, larceny, and a number of traffic violations.

David Earl Howard's testimony tended to show: He, Blossom, Margaret, and Joe went to Brown's place on Sunday afternoon, 5 November. There Lewis bought Joe a drink. Lewis got "green money" back and put it in his shirt pocket. At about 6:00 p.m., after having been at Brown's place for about 20 minutes, Joe told David Earl that he was going to take Lewis to Dody's place (a quarter of a mile away) "to get a pint." At Joe's invitation, the others went, also. Arriving at Dody's, Joe parked the car, and the girls, who were in the back seat, got out first. Lewis, who was sitting on the outside in the front seat, got out next. Joe then said to David Earl, "If that man has got any money, I am going to get it." David Earl made no reply and "did not pay it any mind." At that time, Margaret was not there and could not have heard what Joe said to him. After Lewis and David Earl got out, Joe went behind the old parsonage. When he returned, Lewis and David Earl were talking about a mutual acquaintance. Joe told Lewis that he was ready to get that pint of whiskey so that they could get drunk. Lewis told him to wait, that he could see he was "talking to this boy." Joe hit him in the face. Lewis fell across the car and rolled to the ground, his nose bleeding. David Earl pulled him from in front of the car. When he did, Lewis grabbed his sleeve, getting blood on his shirt (Exhibit 9). That was the only time David Earl ever touched Lewis. Joe then got back into the car and was sitting there when Melvin Tripp came up and asked what was going on. David Earl told him that he had just pulled Lewis, whom Joe had knocked down, from under the car. Lewis was moaning and groaning. Tripp advised them to leave before they got into trouble. David Earl did not tell Tripp that if he came over there he would shoot him. Tripp left.

David Earl started into Dody's to get the girls just as Margaret came out. She asked him for money with which to buy some cigarettes and a pickle. He had $7.00 and he gave her a dollar. She went in, made her purchases, and returned with the change. As they prepared to leave, Blossom asked Joe where Lewis was. Joe said that he had gone down the road somewhere. David Earl observed that Lewis' body was not where he had put it. He scratched his head and said,

"Wonder where he went to?" When he asked Joe where the man went Joe said, "He left, went down there some place."

In attempting to leave Dody's place, Joe hit Smith's car. Shortly thereafter David Earl gave Joe a dollar, and he and the girls left before the patrolman arrived. At no time did David Earl take anything from Lewis, and he never saw Joe take anything.

David Earl is 22 years old. He has been convicted of robbery in New York and larceny of an automobile in North Carolina.

At the conclusion of his own evidence, and at the conclusion of all the evidence, each defendant renewed his motions for judgment of nonsuit. The motions were overruled.

The jury's verdict as to each defendant was "guilty of murder in the first degree with recommendation of life imprisonment." From the judgment that he be imprisoned in the State's prison for the term of his natural life, each defendant appealed.

*T. W. Bruton, Attorney General, and Harry W. McGalliard, Deputy Attorney General, for the State.*

*L. H. Ross for David Earl Howard, defendant appellant.*

*Junius D. Grimes, Jr., for Joe Howard, defendant appellant.*

SHARP, J.

Each defendant assigns as error the court's refusal to grant his motions of nonsuit. The theory of the State's case is that the defendants murdered Lewis in the perpetration of a robbery (G.S. 14-17), and that each was present aiding and abetting the other in the commission of that felony. Each defendant contends that the other killed and robbed Lewis without his assistance or connivance; that he was merely present, took no part in the assault and robbery, and did not share in the proceeds.

[1-3] Had either defendant rested at the close of the State's case, he would have been entitled to have his motion of nonsuit considered solely upon the State's evidence and without reference to the testimony and evidence of the other defendant. *State v. Frazier and State v. Givens*, 268 N.C. 249, 150 S.E. 2d 431. Since, however, each offered evidence, in passing upon the motions for nonsuit, we must consider all the evidence in the case. G.S. 15-173; *State v. Prince*, 270 N.C. 769, 154 S.E. 2d 897. Thus, each defendant's motion must be finally considered not only in the light of the State's evidence but also in the light of that offered by his codefendant. *State v. Norton*, 222 N.C.

418, 23 S.E. 2d 301. The preliminary statement of facts manifests the sufficiency of the evidence to overcome each defendant's motion of nonsuit.

Both defendants also assign as error the ruling of the court which permitted the coroner, Bonner Paul, to testify that in his opinion Lewis' death resulted from "the laceration of the brain caused by a fractured skull." When the State tendered Paul as an expert "in the cause of death when there is evidence of violence," defendants objected. The court overruled the objection and found Paul to be "expert in the field of coroner's work and in the examining of bodies to determine cause of death when there is some evidence of violence." Defendants did not except to this finding. They did, however, object and except to Paul's opinion testimony as to the cause of Lewis' death.

The State's evidence with reference to the witness' training in "coroner's work" tended to show: Paul graduated from a college of mortuary science in 1936, and since then has attended seminars at North Carolina Memorial Hospital in Chapel Hill and Bowman Gray School of Medicine in Winston-Salem. During the last five years he has regularly attended coroners' schools. While on duty in the Navy he graduated from the Hospital Corps School at Portsmouth, Virginia. In the last twenty years, he has "examined approximately a thousand questionable deaths."

Paul's qualifications and experience clearly qualify him as an expert mortician. Notwithstanding, defendants contend that he lacked sufficient medical training to give an opinion as to the cause of Lewis' death, and that his testimony was highly prejudicial to them.

[4]     The authorities differ as to when an undertaker, or other witness who is not a medical expert, may express an opinion as to the cause of death. 23 C.J.S. *Criminal Law* § 878(2), p. 458-459 (1961); 32 C.J.S. *Evidence* § 546(92) (1964); 31 Am. Jur. 2d *Expert and Opinion Evidence* § 105 (1967); Annot., Admissibility of opinion evidence as to cause of death, disease, or injury, 136 A.L.R. 965 (1942), and Supplementary Annot. in 66 A.L.R. 2d 1082 (1959). See the discussion of the problem in *State v. Smith*, 221 N.C. 278, 20 S.E. 2d 313. The general rule, however, is that the opinion of a nonmedical witness as to the cause of death is admissible if the witness is qualified by experience and observation to give an opinion, and the facts to be interpreted are not of such a nature as to render valueless any opinion but that of an expert in a particular field. *Gillikin v. Burbage*, 263 N.C. 317, 139 S.E. 2d 753; 31 Am. Jur. 2d *Expert and Opinion Evidence* § 99 (1967). In *Jordan v. Glickman*,

219 N.C. 388, 14 S.E. 2d 40, this Court said: "We do not subscribe to the doctrine that the cause of death can be proven only by the opinion of a physician, or other expert witness." *Id. at* 391, 14 S.E. 2d at 42. In *Gillikin v. Burbage, supra* at 325, 139 S.E. 2d at 760, it is said: "There are many instances in which the facts in evidence are such that any layman of average intelligence and experience would know what caused the injuries complained of." In such case, evidence is admitted upon the ground that it "is more in the nature of a fact than an opinion." Annot., 136 A.L.R. 965, 1005 (1942).

[5, 6]    In a homicide case it is, of course, always best to have testimony of medical experts "as to the fatal character of wounds" if such evidence is available. *Revels v. State,* 64 Fla. 432, 59 So. 951. Where, however, such evidence is not accessible, a nonexpert who saw the wounds upon the body of the deceased may describe them to the jury. If his training and experience convince the court that he is qualified to do so, he may express an opinion as to whether the wounds caused the death — unless they are of such a nature as to render valueless any opinion except that of an expert. In any event, where the injuries are of such a character that any person of ordinary intelligence would know that they caused the death, the witness' expressed opinion cannot be held for prejudicial error. In *Foley v. Crawford,* 125 Kan. 252, 264 P. 59, an ambulance driver, who found a body at the bottom of an elevator shaft, testified over objection that the deceased died of a broken neck. The court said: "It did not take an expert to testify that the boy's death had been caused by his neck being broken. Any intelligent person who examined the body could have testified to that fact." *Id.* at 255, 264 P. at 61.

In this case, all the evidence tends to show: Prior to the time he alighted from Joe's automobile at Dody's place, Lewis was uninjured. Although he had been drinking, he was still able to make the rounds of places where liquor could be bought. At Dody's, he was knocked down by one of the defendants, dragged for an appreciable distance, and left beside an abandoned parsonage. There he was found dead the next morning, his skull fractured and his brain lacerated. A bloody cinder block was beside his head.

It did not take a doctor to determine that he had died from the visible head injuries. Paul's evidence was competent, but the State's case did not depend upon it. *State v. French,* 225 N.C. 276, 34 S.E. 2d 157. Without the benefit of his opinion, the jury would undoubtedly have arrived at the same conclusions he did. Defendants' assignments of error based on exceptions to the admission of this evidence are overruled.

[7]    David Earl took no exception to the judge's charge to the jury. Joe assigns as error the following portion of the charge: ". . . The court further instructs you that the injury inflicted by the defendants, or either of them, must be the proximate cause of the deceased's death."

Taken out of context, as it is in the assignment of error, the foregoing statement might be interpreted as an assumption by the trial judge (a) that one or both of the defendants fractured Lewis' skull and (b) that the fracture caused his death. Considered in its relation to the entire charge, however, it is inconceivable that the jury understood the judge to be telling them that he thought these were facts which had been proven. Throughout the charge, he made it quite clear that, in order to convict either defendant of murder, the State must satisfy the jury beyond a reasonable doubt either that the particular defendant had inflicted injuries on the deceased which proximately resulted in his death or that the injuries had been inflicted by the other pursuant to a conspiracy between the two defendants to rob Lewis. This assignment of error is not sustained.

[8]    Joe's other assignment of error to the charge is that, when he concluded, the judge inquired of counsel, "Anything further gentlemen?" The solicitor, Mr. Ross and Mr. Grimes, all responded, "No." Joe now argues that counsel were compelled to answer, "No"; that this answer caused the jury to assume that there was no error in the charge and that this assumption prejudiced defendant. We are unable to follow this reasoning. Although it is better practice for the court to make such an inquiry of counsel at the bench, where the jury cannot hear any colloquy which might result, we can imagine no prejudice to either of these defendants from the court's question.

[9-11]    Joe's remaining assignment of error to the charge is that the court did not give the following requested instructions:

(a)    "That it was not the duty of or legal obligation of defendant Joe Howard to take any overt action or come to the rescue or defense of the deceased Major Wright Lewis.

(b)    "That if the jury believes all of the facts in these cases to be as testified to by the defendant, Joe Howard, then it shall be their duty to return a verdict of not guilty on all counts."

Even if a defendant is entitled to requested instructions, the court is not required to give them verbatim. It is sufficient if they are given in substance. *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769, 96 A.L.R. 2d 1422, *cert. denied,* 368 U.S. 851, 82 S. Ct. 85, 7 L. ed. 2d 49. The judge gave the substance of requested instruction (a)

when he charged the jury that "mere presence" at the scene of the crime "would place no legal obligation on either of the defendants . . . to take any overt action or come to the rescue of the deceased Major Wright Lewis." The fact that the court included both defendants in the same instruction was not prejudicial to either.

Requested instruction (b), although not given *ipsissimis verbis,* was implicit in the entire charge. Had it been given as requested, it would not have enhanced Joe's position. His testimony exculpated him, and had the jury believed it — or had it raised in their minds a reasonable doubt of his guilt — under the charge, they would necessarily have acquitted him. The court instructed the jury that, unless they were satisfied beyond a reasonable doubt (1) that Joe, while perpetrating or attempting to perpetrate a robbery, inflicted injuries on Lewis which proximately caused his death; or (2) that he and David Earl had conspired to rob Lewis, and while both were actively participating in robbing or attempting to rob Lewis, one or both of them inflicted injuries upon him thereby causing his death, they would acquit Joe Howard. Had the instruction been given as requested, the jury might have been led to believe that, unless they believed all of defendant's testimony, they should find him guilty. The failure to give the requested instruction cannot be held to be prejudicial error. *State v. Faust, supra.*

[5]  David Earl's brief makes it clear that his appeal is based upon the contention that the State obtained the shirt, which he was wearing on the evening of 5 November 1967 (Exhibit 9), by an unlawful search and seizure, and that its admission into evidence was error entitling him to a new trial.

G.S. 15-27 provides in pertinent part that ". . . no facts discovered . . . or evidence obtained without a legal search warrant in the course of any search, *made under conditions requiring the issuance of a search warrant,* shall be competent as evidence in the trial of any action." (Emphasis added.) Since Deputy Sheriff Davis, who took the shirt from David Earl's room in his absence, had no search warrant, the question is whether one was required. A precis of the facts surrounding the seizure of the shirt follows:

Sheriff Harris, Davis' principal, first learned of the death of Lewis about 1:20 p.m. on Monday, 6 November 1967. Harris arrived at the parsonage, where Tripp had discovered the body, about 1:40 p.m. Harris learned from Tripp the facts about which Tripp testified at the trial, that is: Between 6:00 and 7:00 p.m. on the preceding evening Tripp, who lives across Gray Road from the abandoned parsonage, went to his car, which he had parked at the par-

sonage. He heard "leaves scuffling" and heard David Earl, whom he had known for 14 years, say, "Don't come this way; I'll shoot." Then he saw David Earl standing beside a black Ford, and, sticking out in front of that car, he saw a pair of shoes, toes pointed skyward, and "two pants legs up to about midway the calf." He asked David Earl what was wrong with him. When he got no reply, Tripp left. Upon his return, between 10:00 and 11:00 p.m., he found David Earl and the black Ford gone. The next day, between 12:00 noon and 1:00 p.m., when he went back to his car, he discovered the body of Lewis lying by the parsonage. He left in his automobile to notify Sheriff Harris, who came to the scene and observed Lewis' body, the pulpy face, fractured skull, and the bloody cinder block nearby. Harris also saw the pool of blood and the line of disturbed leaves between it and the body.

Obviously Lewis had met a violent death. Sheriff Harris had probable cause to believe that he had been murdered and that David Earl was implicated in the murder. By telephone and radio, he instructed his deputy, Davis, "to pick up" David Earl and bring him to the sheriff's office. Davis went to defendant's place of employment, Moss Planing Mill, where he learned that David Earl had been there that day but was no longer there. At 3:40 p.m., he left Moss Planing Mill and went to defendant's place of residence, arriving there about 4:00 p.m. The landlady accompanied him to David Earl's room, the door to which was open. From the hall, Davis could not see the entire room, but he could see a bloody shirt on the bed. He entered the room, saw that David Earl was not there, picked up the shirt, and departed at once. He "got up with the defendant about four thirty. The warrant was sworn out . . . in the neighborhood of five or five thirty or later."

[12]    The shirt which the officer seized was not contraband nor was it an instrumentality or fruit of the crime for which the officer sought David Earl; it was "mere evidence." The present rules governing the application of the Fourth Amendment to the United States Constitution make no distinction between the seizure of these items. The Fourth Amendment secures "the same protection of privacy whether the search is for 'mere evidence' or for fruits, instrumentalities or contraband. There must — of course — be a nexus — automatically provided in the case of fruits, instrumentalities or contraband — between the item to be seized and criminal behavior. Thus, in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of po-

lice purposes will be required." *Maryland Penitentiary v. Hayden,* 387 U.S. 294, 306-07, 87 S. Ct. 1642, 1650, 18 L. ed. 2d 782, 792.

Before the officer saw David Earl's bloody shirt, he had probable cause to believe that defendant had murdered Lewis and that he would evade arrest if not immediately taken into custody. The sight of the bloody shirt strengthened that belief. Davis, therefore, had the right to arrest defendant without a warrant, G.S. 15-41(2), and to enter his room for that purpose. Since the door was wide open and no forcible entry was made, the provisions of G.S. 15-44 and the decision in *State v. Covington,* 273 N.C. 690, 161 S.E. 2d 140, are inapplicable.

Davis entered the room, not for the purpose of making a general search for evidence of guilt, but in search of defendant himself. Indeed, he made no search at all. While lawfully in the room looking for his suspect, the officer could properly examine and seize "suspicious objects in plain sight." *Harris v. United States,* ...... U.S. ......, 88 S. Ct. 992, 19 L. ed. 2d 1067. He took the shirt with probable cause to believe that it would prove to be evidence of defendant's guilt. *People v. Gilbert,* 63 Cal. 2d 69, 47 Cal. Rptr. 909, 408 P. 2d 365. See Appendix to the Opinion of the Court in *Gilbert v. California,* 388 U.S. 263, 274, 87 S. Ct. 1951, 1957, 18 L. ed. 2d 1178, 1187. If the officers' presence was lawful, the observation and seizure of what was then and there apparent could not in itself be unlawful. *Harris v. United States, supra; Ker v. California,* 374 U.S. 23, 83 S. Ct. 1623, 10 L. ed. 2d 726; *United States v. Horton,* 328 F. 2d 132 (3d Cir.).

[13, 14]　Neither the Fourth Amendment nor G.S. 15-27 is applicable where no search is made. The law does not prohibit a seizure without a warrant by an officer in the discharge of his official duties where the article seized is in plain view. *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25; *State v. Kinley,* 270 N.C. 296, 154 S.E. 2d 95; *State v. Bell,* 270 N.C. 25, 153 S.E. 2d 741; *State v. Giles,* 254 N.C. 499, 119 S.E. 2d 394; *Ker v. California, supra; Harris v. United States, supra.* Of course, the limits of reasonableness which are placed upon searches are equally applicable to seizures, *State v. Chinn,* 231 Ore. 259, 373 P. 2d 392, and whether a search or seizure is reasonable is to be determined on the facts of the individual case. *Cooper v. California,* 386 U.S. 58, 87 S. Ct. 788, 17 L. ed. 2d 730; *Preston v. United States,* 376 U.S. 364, 84 S. Ct. 881, 11 L. ed. 2d 777.

[15]　In this case, we hold that the officer's seizure of the shirt was

reasonable and that it was properly admitted in evidence. *Harris v. United States, supra; Ker v. California, supra.*

[16]    We note that, despite the solicitor's initial announcement that he was not asking for an unqualified verdict of murder in the first degree, the court charged the jury that they might return one of four verdicts as to each defendant: (1) guilty of murder in the first degree; (2) guilty of murder in the first degree accompanied by a recommendation of life imprisonment; (3) guilty of murder in the second degree; or (4) not guilty. Thus did the court avoid the error which caused a new trial in *State v. Denny,* 249 N.C. 113, 105 S.E. 2d 446.

In the instant case, the court's instruction made it quite clear that the first issue in this case was whether a defendant was guilty of murder in the first degree, and, that if convinced beyond a reasonable doubt that he was, the second question for the jury's consideration was whether his punishment should be death or life imprisonment. After reading G.S. 14-17 to the jury, the court charged that, if they found a defendant guilty of murder in the first degree, the jury had an unbridled discretionary right — if exercised at the time of rendering their verdict in open court — to recommend that his punishment be imprisonment for life; that no conditions were attached to, and no qualifications or limitations imposed upon, that right; and, if they so recommended, that life imprisonment would be his punishment. He further charged the jury that "the solicitor for the State stated in open court at the beginning of the trial that he is not seeking the death penalty in this case and . . . (he and) private prosecution for the State have not contended in their arguments that you should return a verdict of guilty of murder in the first degree without the recommendation of life imprisonment. . . ."

In the trial below, as to each defendant,

No error.