## VIOLA GILLIKIN v. LINDA GILLIKIN BURBAGE.

(Filed 15 January, 1965.)

**1. Parent and Child § 2—**

Neither a parent nor his personal representative can sue an unemancipated child for a personal tort, even though liability is covered by insurance, but complete emancipation removes the bar to action between a parent and child for personal torts.

**2. Parent and Child § 1—**

The emancipation of a child may be partial, in which event the parent relinquishes the right to the child's earnings for a certain period or for certain purposes or under certain circumstances, without disturbing other mutual rights and duties; or complete, in which event the parent surrenders all rights to the services and earnings of the child as well as the right to custody and control of his person.

**3. Same—**

Emancipation is not presumed but the burden is upon the parent or person asserting emancipation to prove it.

**4. Same—**

The execution of a formal contract is not required to accomplish the complete emancipation of a minor but the intent and purpose of the parent to emancipate the child may be expressed either in writing or orally, or inferred from the surrounding circumstances or conduct of the parent inconsistent with parental care and control.

**5. Same—**

The fact that a minor child living with her parents would not knowingly transgress their wishes, deferred to their advice, and provided her mother with transportation whenever it was requested, does not in itself negate emancipation.

**6. Same—**

Evidence that a minor child lived in the home of her parents, deferred to their advice and did not knowingly transgress their wishes, but that she worked and supported herself, that she paid her share of the living expenses, purchased a car with her own earnings, that her wages were entirely her own, and that she came and went at her own pleasure, etc., *held* sufficient to be submitted to the jury on the issue of the child's complete emancipation.

**7. Automobiles § 47—**

Evidence that a passenger was standing beside a car with the door open and that the driver permitted her foot to slip from the clutch while the automobile was in gear with the engine running, so that the car lurched forward, swinging the door back against the passenger to her injury, is sufficient evidence, in the absence of explanation, of lack of proper care under the circumstances.

**8. Damages § 3—**

Plaintiff has the burden of showing that defendant's negligence was the proximate cause of the particular injuries for which plaintiff seeks recovery, and when a layman can have no well formed knowledge as to whether a particular injury resulted from the accident there can be no recovery of damages therefor without expert medical testimony of causation.

**9. Same—**

Testimony of plaintiff that when the door of defendant's car hit her the blow twisted her body and knocked her against the side of the car, together with testimony of a physician that when he examined plaintiff some time after the accident she had a ruptured disc and that a ruptured disc usually occurs as a result of some acute movement which produces a marked flexion, *held* to leave in speculation whether the accident caused the ruptured disc, and the testimony in regard to the ruptured disc should have been stricken on motion.

**10. Same—**

Where the only evidence that plaintiff's injury was permanent and would continue to cause her pain and suffering is testimony of a physician that a condition such as plaintiff's usually improves but could recur, the testimony is insufficient to be submitted to the jury on the question of the permanency of the injury, and it was error for the court to admit in evidence the mortuary table and instruct the jury thereon in regard to the award of the present cash value of future damages.

APPEAL by defendant from *Copeland, S. J.,* April-May 1964 Civil Session of CARTERET.

Civil action for personal injuries sustained by plaintiff when she was struck by the door of defendant's automobile. Plaintiff is the mother of defendant, who, at the time of the acts complained of, was nineteen years of age and unmarried, and was living in the home of her father and mother. Plaintiff alleges that on June 12, 1962, defendant was

emancipated; that defendant owned an automobile in which she had just transported plaintiff as a guest; that immediately after plaintiff had dismounted from the vehicle, defendant negligently released the clutch and thus caused the automobile to lurch forward and the door to strike plaintiff's body; that the blow resulted in serious and permanent injuries to plaintiff.

Plaintiff's evidence tends to show these facts: Defendant graduated from high school in May 1961. She then advised her parents that she felt able to go out on her own and make her own living. They consenting, defendant left the family home for the home of a sister in Virginia, where, unsuccessfully seeking employment, she remained about two months. Defendant then returned to her parents' home, where she remained as a "guest" until she found employment in Morehead City. There, she worked for about three months with two different employers. During these months defendant's father did not know where she was working nor how much money she was making. About January 1, 1962, defendant became a secretary at Hardesty Motors and worked there continuously up through the time of the accident in suit. Defendant's wages were entirely her own, and her father did not list her as a dependent on his income-tax return after the year 1961.

After going to work at Hardesty Motors, defendant purchased a two-door, standard-transmission, 1956 Ford, which she was operating on June 12, 1962, the day of the accident. Defendant had paid for the automobile herself, and it was solely hers. She alone had made all the arrangements for its purchase and signed the necessary papers. Defendant's father did not drive her automobile, nor did he ride to and from work with her.

In the home, defendant came and went at her pleasure, selected her own companions, and was not subject to any curfew. Her father did not known where she went, so that there was never any reason for him to forbid her to go anywhere. She never did anything, however, which she knew to be contrary to her parents' wishes. She helped round the house and never "defied a request" from her mother. Including defendant, there were three occupants of the home, and she had an agreement with her parents whereby she paid one-third of the living expenses. Defendant married in January 1963. With her husband she continues to live in the home of her parents.

About 1:00 p.m. on June 12, 1962, at plaintiff's request, defendant drove her to a nearby store in defendant's automobile. Upon arriving, defendant stopped the car on the shoulder of the highway, the car's engine still running and the transmission in gear; and plaintiff got out. When defendant spoke to her, plaintiff turned toward defendant. As

plaintiff stood, listening to defendant, between the opened right door and the door frame, defendant's foot slipped off the clutch. The automobile lurched forward, and the door came back suddenly against plaintiff's right hip. The blow "kind of twisted (her) body and knocked (her) against the side of the car." The vehicle moved only a very short distance, and plaintiff was not knocked to the ground. Because the store was closed, plaintiff re-entered the automobile, and she and defendant returned to their home.

Plaintiff developed soreness almost immediately. Hoping that her condition would improve, she took aspirin for her discomfort. On June 17th she discerned a bruise approximately six inches in diameter on her right hip. On June 18th she went to a physician, Dr. DeWalt, and complained of pain and impairment of locomotion. Dr. DeWalt admitted her to the hospital, where she remained twelve days, a part of the time in traction. X-rays revealed no fractures. A week after her release from the hospital, she was again re-admitted for five days.

During the next five months, plaintiff visited Dr. DeWalt at intervals. At the time of the trial Dr. DeWalt was practicing in Chapel Hill. He did not testify. In January 1963 plaintiff consulted Dr. Webb about her back. On that date plaintiff was complaining of pain radiating down into her left hip and leg, and Dr. Webb found spasm in the muscles on both sides of her spine. It was Dr. Webb's opinion, admitted over defendant's objection and exception, that plaintiff then had a ruptured disc in the interspace between the fourth and fifth lumbar vertebrae and that "a ruptured disc usually occurs with some acute movement which produces a marked flexion, that is, bending forward or extension of the spinal column."

In September 1963, Dr. Webb, while treating plaintiff for a stomach disorder, caused x-rays to be made of her abdomen and coincidentally discovered that plaintiff was suffering from scoliosis, or a curvature of the spine usually congenital, and that there were some osteoarthritic changes in the spine not abnormal for a person of plaintiff's age, fifty-eight. Her medical bills totaled $462.50.

Before the accident here complained of, plaintiff's health was good, and she had had no back trouble. She had done all her own housework and had helped in the garden. Since the accident plaintiff has been in continual pain. She must sleep on a board, and she rests but poorly. She cannot stoop to retrieve objects from the floor, and she has difficulty raising herself from a sitting position and climbing steps. She takes medicine daily and must rest frequently. In the home she is obliged to restrict her efforts to a little cooking and dishwashing.

Asked if he had an opinion as to whether plaintiff's condition would improve with regard to pain, Dr. Webb answered, "In my opinion, sir, I think these conditions usually do improve. It is also my opinion that they can re-occur." The mortuary table, admitted over defendant's objection, indicated a life expectancy of 17.3 years for plaintiff.

Defendant offered no evidence. Her motion for judgment as of nonsuit, made at the close of the evidence, was overruled. The jury in answer to appropriate issues, found: (1) defendant was an emancipated minor on June 12, 1962; (2) plaintiff was injured by defendant's negligence; and (3) plaintiff is entitled to recover of defendant $5,-462.50. Judgment was entered upon the verdict, and defendant appeals.

*Wheatly & Bennett by C. R. Wheatly, Jr. and E. Glenn Kelly for plaintiff.*

*Dupree, Weaver, Horton & Cockman by F. T. Dupree, Jr., and Jerry S. Alvis for defendant.*

SHARP, J. Defendant's first assignment of error relates to the failure of the court to sustain her motion for nonsuit.

It is the rule in North Carolina, and the majority of the other states, that an unemancipated minor child cannot maintain a tort action against his parent for personal injuries, even though the parent's liability is covered by liability insurance. This rule implements a public policy protecting family unity, domestic serenity, and parental discipline. *Redding v. Redding,* 235 N.C. 638, 70 S.E. 2d 676; *Small v. Morrison,* 185 N.C. 577, 118 S.E. 12, 31 A.L.R. 1135; Annot., Right of parent or representatives to maintain tort action against minor child, 60 A.L.R. 2d 1285; 39 Am. Jur., *Parent and Child* § 90 (1942); 3 Lee, North Carolina Family Law § 248 (3d Ed. 1963). Upon the same theory, an overwhelming majority of jurisdictions likewise hold that neither a parent nor his personal representative can sue an unemancipated minor child for a personal tort. Annot., Right of parent or representatives to maintain tort action against minor child, *supra;* 39 Am. Jur., *Parent and Child* § 92 (1942). "The child's immunity is said to be the reciprocal of the parent's immunity." 3 Lee, *op. cit. supra* at 176. The *complete* emancipation of a child, however, removes the bar to actions between parent and child for personal torts. Annot., Right of parent or representatives to maintain tort action against minor child, *supra* at 1292. See also Comment, *Tort Actions Between Members of the Family,* 26 Mo. L. Rev. 152, 194.

The emancipation of a child may be complete or partial. A minor may be emancipated for some purposes and not for others, and sim-

ilarly a parent may be freed of some of his obligations and divested of some of his rights yet not freed and divested of others. *Hunycutt v. Thompson,* 159 N.C. 29, 74 S.E. 628. The power to emancipate resides in that parent having the duty to support, ordinarily the father. Partial emancipation usually means "nothing more than the relinquishment of the father's right to the child's earnings for a certain period or for certain purposes or under certain circumstances. The father does not thereby relieve himself of his parental duty to support the child or his parental right to control the child." 3 Lee, *op. cit. supra* § 233. Complete emancipation occurs *by act of the parent* when he surrenders all right to the services and earnings of the child, as well as the right to the custody and control of his person. By corollary, the parent is thereby relieved of his duty to support the child, but "a parent cannot by any process of emancipation relieve himself of the duty to support a child too young or weak to support itself." *Ibid.* Complete emancipation arises *by operation of law* irrespective of the parent's consent when a child marries, *Church v. Hancock,* 261 N.C. 764, 136 S.E. 2d 81, or when the child becomes twenty-one years old, unless the child is so weak in mind or body that he is unable to support himself and remains in the parent's home unmarried. In this latter event, the parent's duty to support the child continues. *Wells v. Wells,* 227 N.C. 614, 44 S.E. 2d 31. Complete emancipation occurs, as well, by operation of law when the parent abandons or fails to support the child; under this circumstance, however, the parent is merely divested of his rights in the person and the property of the child and is not freed of his obligations, for he may not, of course, benefit from his own wrong. A parent's mere waiver of his right to the earnings of the minor child will not alone constitute complete emancipation. *Small v. Morrison, supra; Little v. Holmes,* 181 N.C. 413, 107 S.E. 574; *Wilkinson v. Dellinger,* 126 N.C. 462, 35 S.E. 819; 39 Am. Jur., *Parent and Child* §§ 64-65 (1942). Whether emancipation is complete, so as to remove the bar to a tort action by the parent or his representative against a minor child, depends upon the particulars of each case, and is, therefore, generally a question for the jury. Emancipation will not be presumed; it must be proved, and the burden is on the parent or the one asserting it. *Holland v. Hartley,* 171 N.C. 376, 88 S.E. 507; *accord, Parker v. Parker,* 230 S.C. 28, 94 S.E. 2d 12, 60 A.L.R. 2d 1280; 39 Am. Jur., *Parent and Child* § 64 (1942).

The execution of a formal contract by a parent is not required to accomplish the emancipation of a minor, and the intent and purpose of the parent to emancipate his child may be expressed either in writing or orally. It may likewise be implied from the parent's conduct

and surrounding circumstances. *Daniel v. R.. R.*, 171 N.C. 23, 86 S.E. 174; 3 Lee, *op. cit. supra* § 233. Emancipation may be implied by the assumption of the minor and the parent of a status inconsistent with parental control and care. *Jolley v. Telegraph Co.*, 204 N.C. 136, 167 S.E. 575; 67 C.J.S., *Parent and Child* §§ 88-89 (1950).

"A minor child may live away from the home of its parents and receive his wages for the week, and pay his own expenses therefrom, and yet not be freed from the authority and control of his parents. On the other hand, a minor child while living at home with his parents may be completely emancipated from the control of his father and entitled to the earnings from his services. . . ." 3 Lee, *op. cit. supra* at 75.

As Sherwood, J., wrote in *Dierker v. Hess*, 54 Mo. 246, 250 (1873):

"It is not necessary that the father . . . should proclaim that fact (emancipation) from the housetops, or accompany it by some token or ceremonial as open and as odious as that which formerly attended the manumission of a slave; nor is it necessary to accomplish that end, that the son should cease to be a member of his father's family; that the dearest domestic ties should be rudely sundered, and he driven like some alien and outcast from beneath the paternal roof."

Though defendant in this case was her own provider and her own chaperone, according to plaintiff's evidence, she would not knowingly have transgressed the wishes of her parents. She deferred to their advice as she had always done and, in addition, provided her mother with transportation whenever it was requested. Defendant contends that this shows non-emancipation entitling her to nonsuit. We do not so hold. Such a ruling would be tantamount to holding that complete emancipation requires the repudiation of all habits of filial piety which every good parent labors to inculcate and which, as a result, become instinctive in the child of such a parent. *Felix nati pietate.* Vergil, A. 3, 480. Even when he becomes twenty-one, a child is not suddenly metamorphosed into a chilled stranger to his parents; he remains by common experience in emotional privity with them. Complete emancipation is not *ipso facto* lacking simply because *pietas* endures, no more than it is established simply because *pietas* is lacking. Between the two there is no *necessary* connection. Emancipation has to do with a legal, *pietas* with an emotional, relationship. For complete emancipation, the law does not require the severing of all parental ties; the

parent may continue to receive by grace that which he could formerly command.

Plaintiff's evidence, taken as true, was sufficient to establish defendant's complete emancipation by consent of the father and to make her amenable to suit by her mother. It was also sufficient to establish her liability for actionable negligence. That defendant permitted her foot to slip from the clutch while her automobile was in gear with its engine running was, in the absence of any explanation of this mishap, evidence of a lack of proper care under the circumstances. The motions of nonsuit were therefore properly overruled.

The remaining assignments of error which now merit discussion relate to the issue of damages. Over defendant's objection, exception, and motion to strike, the physician, Dr. Webb, who first examined plaintiff on January 12, 1963, was permitted to testify that in his opinion she then had a ruptured disc in the interspace between the fourth and fifth lumbar vertebrae. It is defendant's contention that plaintiff has adduced no evidence establishing a causal relation between this condition and the accident upon which she bases her suit. These rulings constitute defendant's assignment of error No. 3.

The doctrine of proximate cause which determines the existence of liability for negligence is equally applicable to liability for particular items of damage. To hold a defendant responsible for a plaintiff's injuries, defendant's negligence must have been a substantial factor, that is, a proximate cause of the *particular* injuries for which plaintiff seeks recovery. *Lee v. Stevens*, 251 N.C. 429, 111 S.E. 2d 623; *Byrd v. Express Co.*, 139 N.C. 273, 51 S.E. 851; McCormick, *Damages* § 72 (1935 Ed.).

In this record there is not a scintilla of medical evidence that plaintiff's ruptured disc might, with reasonable probability, have resulted from the accident on June 12, 1962. "If it is not reasonably probable, as a scientific fact, that a particular effect is capable of production by a given cause, and the witness (expert) so indicates, the evidence is not sufficient to establish *prima facie* the causal relation, and if the testimony is offered by the party having the burden of showing the causal relation, the testimony, upon objection, should not be admitted and, if admitted, should be stricken." *Lockwood v. McCaskill*, 262 N.C. 663, 138 S.E. 2d 541, 545. It is true that plaintiff in this case said that when the door hit her, the blow "kind of twisted (her) body and knocked (her) against the side of the car," and that Dr. Webb said, "A ruptured disc usually occurs with some acute movement which produces a marked flexion, that is, bending forward or extension of the spinal column." This combined testimony, however, fails to supply the missing infer-

ence of cause and effect. It only creates conjecture and suggests the possibility. Did the rupture occur when the door hit plaintiff? Did it occur later as a result of that blow, some other type of trauma, or the constant wear and tear in everyday activities of bending, lifting, and moving the spine? Whether either Dr. Webb or Dr. DeWalt could have expressed an expert, medical opinion on the matter of causation, in answer to a properly framed hypothetical question, we cannot say. No such question was asked either. The jurors were left to speculate about a matter which frequently troubles even orthopedic specialists. "One of the most difficult problems in legal medicine is the determination of the relationship between an injury or a specific episode and rupture of the intervertebral disc." 1 Lawyers' Medical Cyclopedia § 7.16 (1958 Ed.).

There are many instances in which the facts in evidence are such that any layman of average intelligence and experience would know what caused the injuries complained of. *Jordan v. Glickman,* 219 N.C. 388, 14 S.E. 2d 40; Annot., Admissibility of opinion evidence as to cause of death, disease, or injury, 66 A.L.R. 2d 1086, 1126, supplementing 136 A.L.R. 965, 1004. For instance, no medical evidence was required to link plaintiff's soreness the next day and the six-inch bruise on her right hip with the incident on June 12th. Where, however, the subject matter — for example, a ruptured disc — is "so far removed from the usual and ordinary experience of the average man that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as to the cause of death, disease, or a physical condition." *Ibid.*

Where "a layman can have no well-founded knowledge and can do no more than indulge in mere speculation (as to the cause of a physical condition), there is no proper foundation for a finding by the trier without expert medical testimony." *Huskins v. Feldspar Corp.,* 241 N.C. 128, 84 S.E. 2d 645; *accord, Burton v. Holding & M. Lumber Co.,* 112 Vt. 17, 20 A. 2d 99, 135 A.L.R. 512; see *Hawkins v. McCain,* 239 N.C. 160, 79 S.E. 2d 493. The physical processes which produce a ruptured disc belong to the mysteries of medicine. Defendant's assignment of error No. 3 is sustained.

Defendant's assignment of error No. 5 raises the question whether the court erred in admitting the mortuary table and giving the following instructions, which permitted the jury to assess damages for permanent injuries.

"The mortuary tables indicate that at the age 58, that being the evidence tending to show was the age of the plaintiff at the date

of the accident, and the plaintiff had a life expectation of 17.3 years; and the plaintiff, of course, has offered these tables into evidence which tend to show what her life expectancy is. . . .

For any future suffering or damages or of decreased earning power you are to decrease any award you make along that line down to the present cash value upon the theory a dollar to be paid now for something to occur in the future is worth more now than in the future; so you will award on that basis if you award anything on this, what is the present cash value of any future loss you find she may sustain."

This assignment of error raises the question whether plaintiff offered any evidence that she has a permanent injury as a result of the occurrence on June 12, 1962. *O'Brien v. Parks Cramer Co.,* 196 N.C. 359, 145 S.E. 684. The answer is No, and assignment of error No. 5 must also be sustained.

There can be no recovery for a permanent injury unless there is some evidence tending to establish one with reasonable certainty. *Kircher v. Larchwood,* 120 Iowa 578, 95 N.W. 184. Upon proof of an *objective* injury from which it is apparent that the injured person must of necessity continue to undergo pain and suffering in the future, the jury may award damages for it without the necessity of expert testimony. Where, however, the injury is *subjective* and of such a nature that laymen cannot, with reasonable certainty, know whether there will be future pain and suffering, it is necessary, in order to warrant an instruction which will authorize the jury to award damages for permanent injury, that there "be offered evidence by expert witnesses, learned in human anatomy, who can testify, either from a personal examination or knowledge of the history of the case, or from a hypothetical question based on the facts, that the plaintiff, with reasonable certainty, may be expected to experience future pain and suffering as a result of the injury proven." *Shawnee-Tecumseh Traction Co. v. Griggs,* 50 Okla. 566, 568, 151 Pac. 230, 231; Annot., Necessity of expert evidence to warrant submission to jury of issue as to permanency of injury or as to future pain and suffering, or to sustain award of damages on that basis, 115 A.L.R. 1149.

Even if we were to assume a causal connection between plaintiff's ruptured disc and the accident on June 12th (an assumption which we cannot make on this record), Dr. Webb's testimony was that such a condition usually improves but *could* reoccur. This falls short of establishing a permanent injury, and plaintiff's counsel made no further effort to show one. Upon this equivocal testimony the jury should

be left to speculate no more whether the condition created by plaintiff's ruptured disc was permanent than what was the cause of it.

In actions for personal injuries resulting in permanent disability, the mortuary table (G.S. 8-46) is competent evidence bearing upon the life expectancy and the future earning capacity of the injured person. Stansbury, North Carolina Evidence § 101 (2d Ed. 1963). It is not admissible unless there is evidence of permanent injury. McCormick, *op. cit. supra* § 86. Without such evidence, the admission of the mortuary table to show the probable expectancy of life would be misleading and prejudicial. "The expectancy of life is only material when the injury is shown to be one which will continue through life," *Vincennes Bridge Co. v. Quinn's Guardian,* 231 Ky. 772, 778, 22 S.W. 2d 300, 303; *accord, Louisville N. A. & C. Ry. Co. v. Miller,* 141 Ind. 533, 37 N.E. 343. When permanence is not shown to be probable, "the admission of evidence as to the probable duration of the plaintiff's life is improper, and can only mislead the jury as to the real import of the testimony upon the question of damages." *MacGregor v. Rhode Island Co.,* 27 R.I. 85, 89, 60 Atl. 761, 763.

For the errors (1) in admitting testimony that plaintiff had a ruptured disc without sufficient evidence of causation and (2) in permitting the jury to consider the mortuary table and award damages for permanent injury without sufficient evidence of permanency, defendant is entitled to a

New trial.