FOOD LION, INC., Plaintiff,

v.

CAPITAL CITIES/ABC, INC., ABC Holding Co., American Broadcasting Companies, Inc., Lynne Litt,[1] Richard N. Kaplan, Ira Rosen and Susan Barnett, Defendants.

No. 6:92CV00592.

United States District Court, M.D. North Carolina, Winston–Salem Division.

May 9, 1997.

---

**1.** After this action was filed, Lynne Litt's name changed to Lynne Dale. Defendants filed a notice of name change but never filed a motion to change the caption. Dale was the name most used during trial. That name will be used here despite the appearance of the name "Lynne Litt" in the caption.

Timothy G. Barber, Charlotte, NC, W. Andrew Copenhaver, David A. Shirlen, Elizabeth B. McGee, Winston–Salem, NC, John J. Walsh, New York City, Richard L. Wyatt, Jr., Washington, DC, Charles Porter, Columbia, SC, for Plaintiff.

H. Hugh Stevens, Jr., Raleigh, NC, Randall J. Turk, William H. Jeffress, Jr., Washington, DC, Douglas M. Martin, Charlotte, NC, Bruce W. Sanford, Washington, DC, for Defendants.

## MEMORANDUM OPINION

TILLEY, District Judge

One of the most difficult and interesting questions presented by this case was whether Food Lion could recover compensatory damages for lost sales, lost profits and other injuries resulting from the publication of the *Prime Time Live* story in November of 1992. The matter was extensively briefed and argued by both sides. On December 20, 1996, after the jury returned a verdict finding Defendants liable for fraud, trespass, and breach of the duty of loyalty, the Court informed the parties that proof of damages resulting from "lost profits, lost sales, diminished stock value or anything of that nature" would not be permitted. (Trial Tr. at 1848). This opinion sets out the rationale for that ruling.

### I.  Facts

This action arises out of efforts by ABC and its employees to obtain a story for the news magazine show *Prime Time Live*. In an effort to obtain footage of Plaintiff Food Lion's food handling (specifically the practices of the meat and deli departments), two *Prime Time Live* producers obtained jobs with Food Lion by submitting false employment backgrounds, false references and other false information. Once they were hired, each producer wore a hidden camera while on the job and recorded some of the events which took place. Some of the footage was broadcast in a November 1992 *Prime Time Live* episode. The report on Food Lion was highly critical of the company's food handling and labor practices. As a result of all of these actions, Food Lion filed suit against ABC, Capital Cities, and several of the individuals involved in the undercover investigation. Of all of the claims originally filed, the claims for fraud, trespass, breach of the duty of loyalty, and violation of the North Carolina Unfair Trade Practices Act [UTPA] survived for trial.

## II.

■ Plaintiff claims that the lost profits, lost sales and other losses which they have labeled collectively as "publication damages" are attributable to the fraud, trespass, breach of the duty of loyalty, and violation of the UTPA committed by Defendants. Defendants argue that Plaintiff cannot recover these types of damages for two reasons: (1) there is not a sufficient causal connection between the damages and the acts committed and (2) such damages are prohibited by the First Amendment. "[i]f a case can be decided on either of two grounds one involving a constitutional question, and the other, a question of statutory construction or general law, the court should decide on the basis of the latter." *Maryland v. E.P.A.*, 530 F.2d 215, 227 (4th Cir.1975), *vacated on other grounds*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977).

■ Resolution of the fraud, trespass, and breach of the duty of loyalty claims is governed by the law of the "forum in which the acts giving rise to the claim occurred." *Tatham v. Hoke*, 469 F.Supp. 914, 916 (W.D.N.C.1979) (citing *Charnock v. Taylor*, 223 N.C. 360, 26 S.E.2d 911 (1943)), *aff'd*, 622 F.2d 587 (4th Cir.1980). Because the fraud, trespass, and breach of the duty of loyalty involved in this suit occurred both in North Carolina and in South Carolina, the law of each of those states will govern this matter.

■ Resolution of the UTPA claim will be governed by the law of North Carolina. Although the actions which are alleged to be a violation of the UTPA occurred in both North Carolina and South Carolina, the actions were part of a united effort by *Prime Time Live* to obtain a story about Food Lion. The North Carolina courts have recognized two different approaches for resolving choice

of law issues under the UTPA. *See, e.g., Andrew Jackson Sales v. Bi–Lo Stores, Inc.*, 68 N.C.App. 222, 314 S.E.2d 797 (1984) (discussing the "most significant relationship test"); *United Va. Bank v. Air–Lift Assocs., Inc.*, 79 N.C.App. 315, 339 S.E.2d 90 (1986) (discussing a test which looks to the law of the state where the injuries were sustained). The North Carolina Supreme Court has not decided the issue but the Fourth Circuit has expressed a preference for the "most significant relationship" test. *New England Leather Co. v. Feuer Leather Corp.*, 942 F.2d 253, 255 (4th Cir.1991). This Court has already determined that, "[t]o the extent that either state has a significant relationship, the relationship of North Carolina is the more significant relationship." *Food Lion v. Capital Cities/ABC, Inc.*, 951 F.Supp. 1224, 1228 (M.D.N.C.1996). Therefore, North Carolina law will govern resolution of the UTPA issues.

## III.

For the purposes of this opinion and this case, it is assumed that the content of the *Prime Time Live* broadcast about Food Lion was true. Food Lion did not challenge the content of the broadcast by bringing a libel suit. Instead, Food Lion attacked the methods used by Defendants to gather the information ultimately aired on *Prime Time Live*.

■ In tort law, including that governing fraud, trespass, and breach of the duty of loyalty[2] in both North Carolina and South Carolina, there is a requirement that the damages ultimately recovered be caused by the tort committed. This causation requirement is sometimes called "proximate cause" and sometimes referred to in other terms. There is, however, no doubt that these torts in both of these states have such a requirement.

**2.** This Court is the first to hold explicitly that this tort would be recognized by the Supreme Courts of North Carolina and South Carolina. *See, Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F.Supp. 1224 (M.D.N.C.1996). The statement that it is subject to the same proximate cause requirements as other torts is, therefore, not based on precedent but instead on general principles of tort law.

The duty of loyalty recognized in this case requires an employee to use her efforts, while

working, for the service of her employer. The jury found that Dale and Barnett each violated this duty by "failing to make a good faith effort toward performing the job requirements of her employer Food Lion as a result of the time and attention she was devoting to her investigation for ABC" and by "performing specific acts on behalf of ABC which proximately resulted in damage to Food Lion."

North Carolina courts have concluded that a trespasser "is liable for all damage proximately resulting from his wrongful entry." *Smith v. VonCannon*, 283 N.C. 656, 197 S.E.2d 524, 528 (1973). Similarly, the South Carolina courts have stated that the harm for which a party may recover "must be the direct result of that invasion [of the land]." *Snow v. City of Columbia*, 305 S.C. 544, 409 S.E.2d 797, 802 (Ct.App.1991). Regarding fraud, North Carolina courts have concluded that "there must be some causal connection between the fraud and the injury alleged, and some relevancy between them and the relief demanded." *Jefferson Standard Life Ins. Co. v. Guilford County*, 226 N.C. 441, 38 S.E.2d 519, 523 (1946). The South Carolina Supreme Court has stated that "recovery [for fraud] is restricted in all cases to such damages as were the natural and proximate consequences of the fraud and such as can be clearly defined and ascertained." *Daniels v. Coleman*, 253 S.C. 218, 169 S.E.2d 593, 596 (1969).

■ Furthermore, proximate cause must be shown before a party can recover damages under the UTPA. The UTPA requires a plaintiff, in order to recover damages, to show actual injury proximately caused by the alleged wrongful conduct. *See. e.g., Ellis v. Smith–Broadhurst, Inc.*, 48 N.C.App. 180, 268 S.E.2d 271, 273 (1980).

III(a). Proximate Cause in North Carolina

The North Carolina courts recognize that "[o]nly if the court is able to determine from undisputed facts that the defendants' [tortious conduct][3] was remote, and not a proximate cause of the injury, does the question become one of law for the court." *Hester v. Miller*, 41 N.C.App. 509, 255 S.E.2d 318, 321 (citations omitted), *rev. denied*, 298 N.C. 296, 259 S.E.2d 913 (1979). It is recognized that "where it is contended that plaintiff's injuries are too remote as a matter of law, the trial court may be required to decide whether the tortfeasor was legally exempt from foresee-

ing plaintiff's injuries in the first place." *Johnson v. Ruark Obstetrics and Gynecology Assocs. P.A.*, 89 N.C.App. 154, 365 S.E.2d 909, 915 (1988), *aff'd*, 327 N.C. 283, 395 S.E.2d 85 (1990).

■ The North Carolina Supreme Court has stated that

[a]n event which is a 'but for' cause of another event—that is, a cause without which the second event would not have taken place—is not, necessarily, the proximate cause of the second event. While one event cannot be the proximate cause of another if, had the first event not occurred, the second would have occurred anyway ... the reverse is not necessarily true.

*Ratliff v. Duke Power Co.*, 268 N.C. 605, 151 S.E.2d 641, 648 (1966) (citations omitted). Stated another way, "proximate cause necessarily includes two elements: (1) whether the action of the tort-feasor was the 'cause in fact' of plaintiff's injuries; and (2) whether the tort-feasor's liability should as a matter of public policy extend to those injuries." *Johnson*, 365 S.E.2d at 915.

It is an elementary principle that all damages must flow directly and naturally from the wrong, and that they must be certain both in their nature and in respect to the cause from which they proceed.

'The principle which will not allow the recovery of damages when their existence rests solely on speculation applies both to the fact of damages and to their cause. Thus, a plaintiff cannot recover damages by proving only that the defendant has unlawfully violated some duty owing to the plaintiff, leaving the trier of fact to speculate as to the damages; he must go further and prove the nature and extent of the damage suffered by the plaintiff and that the breach of duty was the legal cause of that damage. Leaving either of these damage questions to speculation on the part of the trier of fact will prevent recovery.'

*kin v. Burbage*, 263 N.C. 317, 139 S.E.2d 753, 759 (1965). Therefore, where the term "negligence" appears in some cited case law the term "tortious activity" may be substituted in brackets throughout this opinion.

---

3. Even though many of the discussions of proximate cause occur in negligence cases, the courts have recognized that "[t]he doctrine of proximate cause which determines the existence of liability for negligence is equally applicable to liability for particular items of damage." *Gilli-*

*People's Center, Inc. v. Anderson,* 32 N.C.App. 746, 233 S.E.2d 694, 696 (1977) (citations omitted). Furthermore, the North Carolina courts recognize the doctrine of independent cause which dictates that events occurring after the original tortious activity may break the chain of causation and relieve the original wrongdoer of liability for the damages ultimately caused. "An efficient intervening cause is a new proximate cause. It must be an independent force which entirely supersedes the original action and renders its effect in the chain of causation remote." *Adams v. Mills,* 312 N.C. 181, 322 S.E.2d 164, 173 (1984). Generally, the concept of foreseeability is linked with the doctrine of independent cause such that it is said "the test ... is whether the intervening act and the resultant injury is one that the author of the primary [tortious activity] could have reasonably foreseen and expected." *Harton v. Forest City Telephone Co.,* 141 N.C. 455, 54 S.E. 299, 302 (1906) (quoted in *Nance v. Parks,* 266 N.C. 206, 146 S.E.2d 24, 28 (1966)). For a potentially intervening cause to be foreseeable by the original wrongdoer, it must be somehow linked to the tortious activity of the original wrongdoer. "[C]ompensatory damages are the natural and probable result of the wrongful acts complained of. They arise out of the tort which is the basis of the action." *Shugar v. Guill,* 51 N.C.App. 466, 277 S.E.2d 126, 131, *modified,* 304 N.C. 332, 283 S.E.2d 507 (1981) (the question of compensatory damages was not before the Supreme Court). Furthermore, "if the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission by another, the injury shall be imputed to the last wrong as the proximate cause, and not to that which was more remote." *Presnell v. Payne,* 272 N.C. 11, 157 S.E.2d 601, 602 (1967). To determine whether foreseeability of the injury exists in a certain situation, the North Carolina courts have set out certain factors to be considered. *Johnson,* 365 S.E.2d at 916. Some of those factors are helpful in this case: (1) whether, in retrospect, it is too highly extraordinary that the act of the tortfeasor caused the injury; (2) whether recovery would place an unreasonable burden upon those engaged in activities similar to

that of the tortfeasor; and (3) whether recovery would enter a field with no sensible or just stopping place. *Id.*

In addition, North Carolina courts have noted that

> foreseeability is only one element of proximate cause, which includes other equally important considerations: whether the cause is, in the usual judgment of mankind, likely to produce the result; whether the relationship between cause and effect is too attenuated; whether there is a direct connection without intervening causes; whether the cause was a substantial factor in bringing about the result; and whether there was a natural and continuous sequence between the cause and the result.

*Wyatt v. Gilmore,* 57 N.C.App. 57, 290 S.E.2d 790, 791 (1982) (citations omitted). The law recognizes that "[a] man's responsibility for his [tortious act] must end somewhere. If the connection between the [tortious act] and the injury appears unnatural, unreasonable and improbable in light of common experience, the [tortious act], if deemed a cause of the injury at all, is to be considered a remote rather than a proximate cause." *Cole v. Duke Power Co.,* 81 N.C.App. 213, 344 S.E.2d 130, 136, *rev. denied,* 318 N.C. 281, 347 S.E.2d 462 (1986).

### III(b).  Proximate Cause in South Carolina

South Carolina, like North Carolina, recognizes that "[o]nly when the evidence is susceptible to only one inference does [legal cause] become a matter of law for the court." *Oliver v. South Carolina Dept. of Highways and Public Transp.,* 309 S.C. 313, 422 S.E.2d 128, 131 (1992). The South Carolina Supreme Court has stated that

> [p]roximate cause requires proof of (1) causation in fact and (2) legal cause. Causation in fact is proved by establishing that injury would not have occurred "but for" the defendant's negligence. Legal cause is proved by establishing foreseeability.... A plaintiff ... proves legal cause by establishing the injury in question occurred as a natural and probable consequence of the defendant's [tortious act].

*Whitlaw v. Kroger Co.,* 306 S.C. 51, 410 S.E.2d 251, 253 (1991) (citations omitted).

The South Carolina Supreme Court has further commented that "proximate cause of the law is not necessarily proximate cause of the logician. Legal proximate cause is determined upon mixed considerations of logic, common sense and experience, policy, and precedent." *Ballenger v. Southern Worsted Corp.*, 209 S.C. 463, 40 S.E.2d 681, 682 (1946).

The South Carolina courts also recognize the doctrine of independent cause which provides that an event occurring after the tortious conduct of the plaintiff may intervene to break the causal chain and cut off plaintiff's liability for the ultimate harm. *See, e.g., Newton v. South Carolina Public Rys. Comm'n*, 319 S.C. 430, 462 S.E.2d 266, 267 (1995) (applying the doctrine of independent cause). Generally, the concept of foreseeability is linked with the doctrine of independent cause such that it is said "the primary wrongdoer's action is a legal cause of an injury if either the intervening act or the injury itself was foreseeable as a natural and probable consequence of that action." *Bramlette v. Charter–Medical–Columbia*, 302 S.C. 68, 393 S.E.2d 914, 917 (1990). For a potentially intervening cause to be foreseeable by the original wrongdoer, it must be somehow linked to the tortious activity of the original wrongdoer. A wrongdoer "may be held liable for anything which appears to have been a natural and probable consequence **of his [tortious activity]**." *Childers v. Gas Lines, Inc.*, 248 S.C. 316, 149 S.E.2d 761, 765 (1966) (emphasis added). "[O]ne is not charged with foreseeing that which is unpredictable or which would not be expected to happen as a natural and probable consequence of the defendant's [tortious] act." *Vinson v. Hartley*, 477 S.E.2d 715, 721 (S.C.Ct.App.1996). Furthermore, "[d]amages are proximately caused if they are the foreseeable result of the defendant's wrongdoing." *Parr v. Gaines*, 309 S.C. 477, 424 S.E.2d 515, 520 (Ct.App.1992). The South Carolina Supreme Court has applied the rule this way:

> [w]here there is a contention that an intervening agency interrupts the foreseeable chain of events, there are two consequences to be tested: (1) the injury complained of, and (2) the acts of the intervening agency. If the acts of the intervening agency are a probable consequence of the primary wrongdoer's action, i.e. 'foreseeable', the primary wrongdoer is liable. However, even if the intervening acts are not foreseeable, the primary wrongdoer is nevertheless liable if his actions alone 'would have caused the loss in the natural course.'

*Young v. Tide Craft, Inc.*, 270 S.C. 453, 242 S.E.2d 671, 676 (1978). Furthermore, "[w]hen the [tortious activity] appears merely to have brought about a condition of affairs, or a situation in which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct or proximate cause and the former only the indirect or remote cause." *Stone v. Bethea*, 251 S.C. 157, 161 S.E.2d 171, 173 (1968).

### III(c). Application

For Food Lion to recover its lost sales, lost profits, and other similar losses, it must show that those losses are directly attributable to the fraud, trespass, and breach of the duty of loyalty committed by Defendants. Plaintiff contends that it can demonstrate that, but for the undercover footage obtained through the tortious activity, *Prime Time Live* would never have broadcast a show about Food Lion. Even accepting this proposition for the purpose of this decision, Plaintiff must still show that the torts of the Defendants were the legal cause of the damages.

### III(c)(1). *Fraud and Trespass*

The analysis must begin with the observation that Food Lion made no defamation claim and, therefore, did not challenge the truthfulness of the broadcast.[4] Recognizing that the broadcast must be assumed to be true for purposes of ascertaining compensatory damages can lead to only one conclusion: Food Lion's lost profits and lost sales

---

4. Food Lion did contend that ABC "staged" certain incidents. The "staging" allegations are the only allegations made in the case which could be interpreted as challenging the truth of the broadcast. These allegations will be discussed below in the section which addresses the duty of loyalty.

were not proximately caused by Defendants' tortious activities. Food Lion's lost sales and profits were the direct result of diminished consumer confidence in the store. While these losses occurred after the *Prime Time Live* broadcast, the broadcast merely provided a forum for the public to learn of activities which had taken place in Food Lion stores. Stated another way, tortious activities may have enabled access to store areas in which the public was not allowed and the consequent opportunity to film people, equipment and events from a perspective not available to the ordinary shopper, but it was the food handling practices themselves—not the method by which they were recorded or published—which caused the loss of consumer confidence. Those practices were not the probable consequence of Defendants' fraud and trespass and it cannot be argued under the evidence in this case that the filming of those practices by the *Prime Time Live* producers set any of those activities in motion. If it can be argued that Defendants should have foreseen the ultimate consequences, the acts of Food Lion employees interrupted any causal connection between Defendants' fraud and trespass so as to render that tortious activity remote from the ultimate loss of profits and sales.

### III(c)(2). *Duty of Loyalty*

If an employee, while working, has a duty to use her efforts for the benefit of her employer and fails to use those efforts for the employer's benefit, it is foreseeable that the employer may be damaged by loss of productivity and other similar expenses. In this case, however, the breach of the duty of loyalty which occurred as a result of Ms. Dale and Ms. Barnett each failing to make a good faith effort to perform her Food Lion job as a result of the time and attention she was devoting to her investigation for ABC did not proximately result in the loss of sales and profits claimed by Food Lion as "publication damages." Had Ms. Dale and Ms. Barnett breached their duty by setting up scenes which were later broadcast, then that breach of their duty could be the proximate cause of "publication damages."

During the arguments on whether the alleged incidents of staging could be placed before the jury, Food Lion's counsel stated that its expert would opine that there are two forms of staging and that those two forms are (1)active staging and (2)passive staging. Plaintiff's counsel stated that the expert would define the concept such that "active staging would be actions that cause something to happen that otherwise would not have happened, and passive staging is failing to do something with a potential of causing something to happen that otherwise would not have happened." (Trial Tr. at 1939).

Evidence was presented to the jury during the liability phase about allegedly staged incidents. These incidents were (1) the "stashed" salami; (2) the moldy kielbasa; (3) the deli gloves; (4) the macaroni salad; (5) the "sabotaged" hot water heater; and (6) failure to clean the meat saw. The evidence concerning the stashed salami was that an out-of-date salami was in the deli cooler and Ms. Barnett failed to throw it away. She did film the salami on several different days, noting that it had not been removed from the cooler. The evidence concerning the moldy kielbasa was that a piece of kielbasa was in the deli case and Ms. Barnett saw that some mold had grown on the kielbasa. Instead of removing it and throwing it away, Ms. Barnett sold it to Ms. Dale and another ABC employee who came to the deli counter. The incident involving the deli gloves occurred after a customer allegedly complained that the deli employees failed to wear plastic gloves. The deli manager informed Ms. Barnett that the gloves had been misplaced and that she was unaware of their location. On one of the tapes that Ms. Barnett filmed, she focuses on the box of deli gloves but does not tell the deli manager that she knows of its whereabouts. The Plaintiff's presentation concerning the macaroni salad shows that Ms. Barnett was aware that the macaroni salad in the deli display case was old and steered Ms. Dale and another ABC employee in the direction of the macaroni salad to make a purchase. There was also evidence presented from which the jury could have concluded that Ms. Dale disabled a water heater in order to, Food Lion argued, allow

her to film an improperly cleaned meat department and a dirty meat grinder. In addition, there was evidence that Ms. Dale told her market manager that she knew how to clean the market when she did not. As a result, she asked another Food Lion employee to help her clean the market. That employee, Linda Anglin, was apparently never responsible for cleaning the market and did not know how to break down the equipment during the cleaning process. Ms. Dale watched her cleaning and asked her about breaking down the equipment. In response to Ms. Dale's questions about breaking down the equipment, Ms. Anglin told Ms. Dale that she had never been taught how to break down the equipment. These incidents were the only incidents of "staging" that were presented during the liability phase of the trial and are, therefore, the only incidents regarding the duty of loyalty or "staging" which could even arguably be the proximate cause of part of the "publication damages" which Food Lion claimed. Here, however, those damages were not proximately caused by any such breach.

First of all, some of these incidents never were presented on the broadcast and were therefore incapable of ultimately being a part of Food Lion's "publication damages."[5] The broadcast contained references to the out-of-date macaroni salad, the dirty meat grinder, the fact that the deli employees "didn't wear gloves," and the fact that Ms. Anglin didn't break down the equipment when she cleaned the market. Of all the incidents of staging alleged, these four were the only ones presented on the broadcast. The other incidents, therefore, could not possibly have caused Food Lion to suffer "publication damages" and need not be discussed further.

Of the remaining four incidents, none can be considered to be the proximate cause of Food Lion's damages. First, neither the incident involving the plastic gloves nor the incident of the dirty meat grinder was set in motion by the ABC employee involved. Regarding the plastic gloves, the evidence was that the deli employees never wore gloves while Ms. Barnett worked there. This was not a situation where the employees were wearing gloves and the gloves subsequently disappeared thereby allowing Prime Time Live to report that the employees didn't wear gloves. Instead, the employees were not wearing gloves when Ms. Barnett started working at Food Lion. There was evidence that Ms. Barnett was told by the deli manager that the deli manager did not know the whereabouts of the gloves and that Ms. Barnett never informed the deli manager of the location of the gloves when she learned their whereabouts. The plastic glove incident was not set in motion by Ms. Barnett's actions. Ms. Barnett did not create a situation which would not have otherwise existed in order to allow Prime Time Live to report on that situation.

The incident involving the dirty meat grinder was, likewise, not caused by Ms. Dale's actions. Food Lion alleged that Ms. Dale disabled a water heater which then prevented proper cleaning of the meat market due to the absence of hot water. Food Lion asserted that this enabled Ms. Dale to film a dirty meat grinder and that the meat grinder would not have been dirty if the water heater had been functioning properly.[6] The jury specifically found that Ms. Dale did not intentionally damage Food Lion property. Based on the jury's finding, the damage to the hot water heater and the inability to clean the market properly were not due to Ms. Dale's actions.

The remaining incidents involve the macaroni salad and the report that employees never broke down the meat saw when cleaning the meat market. Regarding the failure to break down meat market equipment while cleaning, the allegation made by Food Lion was that Ms. Dale told the market manager

5. Although the broadcast was never presented at trial, the Court takes judicial notice of its contents. Because it was publicly disseminated, it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

6. It should be noted that the Prime Time Live broadcast did tell the viewers that the failure to properly clean the equipment was due to a problem with the hot water heater. The point made by the program was that the grinder was used the following morning, even after the hot water was restored, without ever being cleaned.

that she knew how to clean the meat market when she really did not and that she then asked [7] Linda Anglin to clean the market. While Ms. Anglin was cleaning, Ms. Dale asked her about breaking the saw down to clean it and Ms. Anglin reported that she had never been taught how to break the saw down. That exchange was part of the *Prime Time Live* broadcast. Linda Anglin testified at trial that cleaning the market was not one of her job responsibilities and that, therefore, she was never told how to break down the equipment. If Ms. Dale knew that Linda Anglin did not know how to clean the market and induced her to clean it in order to obtain that damaging footage, then the damage might be a foreseeable consequence of Ms. Dale's action. However, there was never any evidence at trial that Ms. Dale knew that Ms. Anglin did not know how to properly clean when she asked Ms. Anglin to help her clean the market. Furthermore, after the scene where Ms. Anglin states that she doesn't know how to break down the saw, there are two more scenes of Food Lion employees saying that they do not break down the saw when cleaning. One of the employees shown is a Food Lion meat market manager. The three scenes are shown one right after the other on the *Prime Time Live* broadcast. There was no allegation that Ms. Dale in any way created a situation which caused the other two employees to say that they did not break down the saw when cleaning. So, not only was there insufficient evidence to show that Ms. Dale knew that Ms. Anglin did not know how to break down the saw when she asked Ms. Anglin to help clean, the incident with Ms. Anglin was only one part of a three part series of clips where each of three employees cleaning a meat market stated that he or she did not break down the saw when cleaning.

Regarding the macaroni salad, Ms. Barnett testified that she asked about the macaroni salad on her first day of work. Her testimony was that the expiration date for the macaroni salad had passed but that the deli manager, Brenda Sparks, instructed her to package it for sale anyway. This exchange

was not on the hidden camera tapes because, according to Ms. Barnett's testimony, she was not wearing a hidden camera on her first two days of work. This testimony was presented in Food Lion's case in chief. A part of Brenda Spark's deposition was offered in Food Lion's case in chief but none of it pertained to the macaroni salad. In Food Lion's rebuttal case, two more questions and answers from that deposition were offered. In the additional deposition testimony Ms. Sparks was asked whether she had ever knowingly sold bad products to consumers and she answered in the negative. Food Lion did not argue in its closing argument that Ms. Barnett put out old macaroni salad. Instead, it argued that Ms. Barnett steered Ms. Dale and another ABC employee in the direction of the macaroni salad when they came into the store to make a purchase. There was no reasonable inference that Ms. Barnett, without instruction from her supervisor, chose to package out-of-date macaroni salad and put it out for sale in order to create a scene for *Prime Time Live*. The only reasonable inference was that Ms. Barnett merely steered Ms. Dale and the other ABC employee in the direction of macaroni salad which she knew to be beyond the expiration date and which was on display for public inspection and sale. She did not create a situation which would not otherwise have existed.

Furthermore, for an event to be the cause of damage, that damage must not only be a foreseeable result of the tort but the tort must also be a "substantial factor in bringing about the result." *Wyatt v. Gilmore*, 57 N.C.App. 57, 290 S.E.2d 790, 791 (1982). The total amount of "publication damages" claimed by Food Lion was somewhere in the neighborhood of 5.5 billion dollars. The clip about the macaroni salad was only a small part of the broadcast which contained many other damaging allegations. This one incident, even if the evidence were sufficient to show "staging," certainly is not a "substantial factor" in bringing about Food Lion's 5.5 billion dollars in damage. In addition,

---

7. Whether Ms. Anglin volunteered to help or was asked to help is a disputed fact. Defendants offered evidence that Ms. Anglin volunteered to help Ms. Dale clean the market. Ms. Anglin testified that Ms. Dale requested her help.

in order for damages to be recoverable, the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy. While neither the existence, causation, nor amount of damages can be left to conjecture, guess or speculation, proof with mathematical certainty of the amount or loss or damage is not required.

*Whisenant v. James Island Corp.*, 277 S.C. 10, 281 S.E.2d 794, 795 (1981). *See also, Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 356 S.E.2d 578, 586 (1987) (stating that "the party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty"). Considering the totality of the items in the broadcast and the total amount of damages claimed by Food Lion as a result, proof of the amount of damages caused by the macaroni salad incident, if it had been "staged," would be impossible to show with any degree of certainty. A jury verdict on such evidence would necessarily be impermissibly speculative.

### III(c)(3). *UTPA*

It has not yet been determined whether the acts of Defendants violated the UTPA. That is an issue that the court must decide as a matter of law. *Hardy v. Toler,* 288 N.C. 303, 218 S.E.2d 342, 346 (1975). Even if those acts are ultimately deemed to be an unfair trade practice within the coverage of the UTPA, those acts were not the proximate cause of Plaintiff's "publication damages."

Specific interrogatories were submitted to the jury for the purpose of the UTPA claim. The jury found that the following acts by Defendants were deceptive: (1) the decision by ABC to have Lynne Dale and Susan Barnett make employment applications to Food Lion utilizing representations about prior, non existent work experience; (2) the submission of the applications for employment by Susan Barnett and Lynne Dale; and (3) the acts of going to work for Food Lion without informing Food Lion that they were ABC employees working on an investigative piece about Food Lion. Those three acts along with the tortious conduct already discussed are the only acts which could be found to violate the UTPA.

Neither the tortious acts nor the deceptive acts, if found to violate the UTPA, could be the proximate cause of Plaintiff's publication damages. It has already been determined that the "publication damages" were not a foreseeable result of Defendant's tortious conduct and, in addition, the independent acts of Food Lion employees broke the chain of causation between Defendants' torts and the ultimate harm. For the same reasons, the three acts found by the jury to be deceptive could not proximately result in "publication damages." The harm to Food Lion which resulted from the broadcast was due to a loss of consumer confidence in the store. That harm is not a foreseeable result which can be linked to the deceptive acts of Defendants. Furthermore, the independent acts of Food Lion employees interrupted any possible causal connection between the deceptive acts and the ultimate harm. Therefore, even if a violation of the UTPA is ultimately found in the acts of Defendants, that violation could not proximately cause Plaintiff's "publication damages."

## IV.  Conclusion

Lost profits, lost sales and other similar damages were not the natural and probable consequence of Defendants' fraud, trespass, breach of the duty of loyalty, or UTPA violation and were not, therefore, the proximate result of those actions. Since this question relating to what has been referred to in this case as "publication damages" may be resolved on causation grounds, it is unnecessary to reach the First Amendment arguments.