SANDY R. TOWNS, Employee v. EPES TRANSPORTATION, Employer, Self Insured, KEMPER RISK MANAGEMENT, Servicing Agent, Defendant

No. COA03-527

(Filed 6 April 2004)

**Workers' Compensation— disability—causation—evidence sufficient**

There was sufficient evidence of causation to justify an award of temporary total disability where plaintiff suffered two neck injuries at home and then one at work within a short span of time, but the first two left her with a stiff neck and did not interfere with her ability to work while the last, at work, resulted in pain said to be indescribable and a trip to the emergency room with fears of a heart attack, symptoms consistent with ruptured discs.

Appeal by defendant from opinion and award filed 27 January 2003 by the North Carolina Industrial Commission. Heard in the Court of Appeals 26 February 2004.

*Charles Peed and Associates, PA, by Charles O. Peed, for plaintiff-appellee.*

*Tuggle, Duggins & Meschan, P.A., by Jospeh F. Brotherton and Steven P. Weaver, for defendant-appellant.*

BRYANT, Judge.

Epes Transportation (Epes) and its servicing agent Kemper Risk Management (collectively defendants) appeal an opinion and award filed 27 January 2003 by the North Carolina Industrial Commission (the Commission) awarding temporary total disability compensation to Sandy R. Towns (plaintiff).

At the hearing before the Commission, plaintiff testified she had worked for Epes as a local truck driver since April 1998. Her job involved driving eighteen-wheelers back and forth between Greensboro and Winston-Salem, North Carolina. Upon arrival at her destination, plaintiff's duties included rolling down the truck's landing gear. This manoeuver required plaintiff to position herself between the truck and the trailer to disconnect the air lines, the fifth-wheel pin, and the pigtail. In order to disconnect the fifth-wheel pin, plaintiff "had to use both hands and . . . pull really hard to get it to pull

out and lock." The mechanism for the fifth-wheel pin varied per truck, and the level of difficulty in getting the pin to release increased if the trailer was not level.

On 24 August 1998, plaintiff injured herself at home while trying to avoid stepping on her dog. Plaintiff saw a doctor the next day, who diagnosed her with a pulled rotary cuff in her right arm and prescribed a muscle relaxant for the tightness in her neck. On 1 September 1998, plaintiff again injured herself at home when her bed collapsed while she was lying on it. Although plaintiff's neck felt stiff the next morning, it was no worse than after her previous injury. Plaintiff went to work as usual and did not require a doctor.

At work on 2 September 1998, after "dropping" her fourth trailer of the day, plaintiff was "trying to get the fifth-wheel pin to release." She was on her "third pull," giving "it everything [she] had," when she suddenly "thought someone had stabbed [her] in the neck." She felt an indescribable pain. Her arms went numb, and her knees were in extreme pain. Plaintiff notified her dispatcher that she had injured herself while "trying to drop a trailer" and needed to see a doctor. She then telephoned her fiancé, who took her to the doctor. Within days of the incident at work, plaintiff was diagnosed with two ruptured discs in her neck, requiring two surgeries. From 24 August 1998 until plaintiff sustained her work injuries on 2 September 1998, plaintiff had been able to perform her job duties. Following the incident at work on September 2, plaintiff could no longer work.

When plaintiff initially sought medical help after the 2 September 1998 incident, she explained "everything that [she] had went [sic] through," ranging back to her August 24 accident. Plaintiff told the physician's assistant who initially examined her that she thought her injury stemmed from her attempt to release the fifth-wheel pin and described the pain she had felt at that time. The physician's assistant, however, "led [her] to believe that it was the bed falling" that had caused her injury.[1] Plaintiff was later referred to Dr. Louis Pikula, Jr., a neurosurgeon, who performed the first surgery on plaintiff's neck. At the time of plaintiff's second operation, Dr. Pikula had retired and plaintiff was in treatment with Dr. William R. Brown, Jr. On 13 September 2000, Dr. Brown wrote a "To Whom It May Concern" letter with regard to plaintiff's injury, stating:

This patient has been under my care for some time. She returns today with clarification of the onset of her illness. The patient

---

1. Defendants did not object to this testimony.

states that on 09/01/98 while at home, she had a bed fall on her neck. This produced the immediate onset of neck pain. The next day, she was able to go to work; however, when she was pulling a fifth-wheel pin, she had the sudden onset of increased pain in her neck and numbness in both hands. It was after that she saw Dr. Pikula. Dr. Pikula worked the patient up and found that she had a cervical disc and she subsequently underwent surgery.

It is my opinion that this patient's present problem of neck pain and her surgeries, both by Dr. Pikula in November 1998 and myself in June 1999, were both the result of this injury that she sustained at work.

Plaintiff testified that the letter conformed to her conversations with Dr. Brown on the cause of her neck injury after she had informed him of the incidents involving her dog, the collapsing bed, and the dropping of the trailer.

Dr. Pikula's deposition testimony reveals that he performed surgery on plaintiff's neck on 17 November 1998 to relieve neck and arm pain she was experiencing due to a ruptured disc at C5-6 and C6-7. Dr. Pikula testified "any type of pressure or any type of movement can give you a ruptured disc." Therefore, Dr. Pikula did not know what caused plaintiff's injury. Dr. Pikula stated plaintiff's disc rupture could have been caused by the incident involving plaintiff's dog, the collapsing bed, or the fifth-wheel pin but could not be pinpointed to one specific event absent serial x-rays showing a ruptured disc at one point in time as opposed to another. Dr. Pikula only recalled plaintiff telling him about the bed collapse when plaintiff saw him on 15 September 1998, but added that she had also informed him of returning to work the next day where she had "picked up a paper tin, or . . . something doing [sic] with her truck, and she [had] turned her head and developed pain in her neck at this time." When asked if it were possible that an error had occurred during the dictation of his medical notes resulting in the transcription of "picked up empty paper tin" instead of "pulled fifth-wheel pin," Dr. Pikula responded he did not know because two years had passed since the medical notes were transcribed.

Dr. Brown's deposition testimony tends to show that plaintiff was referred to him with neck pain and pain in both arms in May 1999. Plaintiff told Dr. Brown "her injury had begun after a bed fell on her neck in September [1998]." Because plaintiff complained of worsening symptoms, Dr. Brown obtained a new set of x-rays and performed

a cervical MRI scan of her neck, revealing that level C5-6 had not fused satisfactorily. After Dr. Brown operated on plaintiff to attempt another fusion, her symptoms initially subsided but eventually returned. Based on Dr. Brown's recommendation, plaintiff did not return to work.

At the deposition, Dr. Brown was shown the "To Whom It May Concern" letter he had authored and was asked if he recalled the underlying conversation with plaintiff mentioned in the letter. Dr. Brown responded he did not remember the conversation. When asked what he did remember about the etiology of plaintiff's neck injury, Dr. Brown testified:

> that she first sustained an injury in bed, that the symptoms from this seem to abate, that she is able to return to work, and that the following day she sustained an injury while at work where she was pulling on part of the machinery of her truck and had an episode of neck and arm pain that subsequently brought her to the attention of Dr. Pikula and her first operation.

Dr. Brown expressed the opinion plaintiff "sustained an injury to her neck as a result [of] the lifting of the machinery or what she refers to as her fifth wheel that caused her to have the surgery." Dr. Brown explained his opinion was based not only on the conversation he had with plaintiff leading to the "To Whom It May Concern" letter but on:

> the fact that the patient was able to get up and go to work, that the amount of pain that she had prior to the injury lifting the fifth wheel was not significant enough for her to stop what she was doing, but once she did injure herself, the degree of pain was.

Dr. Brown further testified that plaintiff's symptoms, experienced only after she attempted to pull the fifth-wheel pin, of the sudden onset of pain, numbness, tingling in the musculature, and a mistaken belief of experiencing a heart attack, were consistent with symptoms experienced by people with a ruptured disc. Plaintiff's medical records reveal that she reported to the emergency room on 2 September 1998 with these symptoms and concerns of experiencing a cardiac episode.

In its 27 January 2003 opinion and award, the Commission found in pertinent part:

**TOWNS v. EPES TRANSP.**

[163 N.C. App. 566 (2004)]

Defendant[s] ha[ve] denied [plaintiff's] claim on the basis that the neck condition for which plaintiff was treated was not due to her injury at work but was due to the bed collapsing. It appears that plaintiff did have three neck injuries within a short period of time, including an injury at work which caused the most severe symptoms. She reported her injury at work immediately and sought medical treatment right away. Although there was some misunderstanding by the medical providers regarding what was involved in disconnecting her trailer, her histories were reasonably consistent during the first month. Although she did try to turn the focus towards the bed incident . . . , it was the injury at work which caused her to seek medical treatment due to the severity of the symptoms associated with that final injury.

The Commission concluded plaintiff had sustained an injury by accident arising out of and in the course of her employment and awarded compensation for plaintiff's temporary total disability and medical expenses.

---

The dispositive issue is whether plaintiff presented sufficient evidence of causation.

For an injury to be compensable under the Workers' Compensation Act, it must be proximately caused by an "accident arising out of and in the course of the employment." N.C.G.S. § 97-2(6) (2003). There must be competent evidence to support the inference that the accident in question caused the injury complained of, i.e. "some evidence that the accident at least might have or could have produced the particular disability in question." *Click v. Freight Carriers*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). "The quantum and quality of the evidence required to establish *prima facie* the causal relationship will of course vary with the complexity of the injury itself." *Id.* There will be "many instances in which the facts in evidence are such that any layman of average intelligence and experience would know what caused the injuries complained of." *Gillikin v. Burbage*, 263 N.C. 317, 325, 139 S.E.2d 753, 760 (1965). Where, however, "the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." *Click*, 300 N.C. at 167, 265 S.E.2d at 391.

**TOWNS v. EPES TRANSP.**

[163 N.C. App. 566 (2004)]

Defendants in this case contend that because Dr. Brown could not recall the conversation with plaintiff that prompted him to write his causation opinion in the "To Whom It May Concern" letter, his opinion on the issue of causation was based on mere speculation and conjecture and therefore did not qualify as competent evidence. *See Young v. Hickory Bus. Furn.*, 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000) ("when . . . expert opinion testimony is based merely upon speculation and conjecture, . . . it is not sufficiently reliable to qualify as competent evidence on issues of medical causation"). As Dr. Brown testified that he also based his causation opinion on the symptoms experienced by plaintiff while attempting to pull the fifth-wheel pin, defendants' argument is without merit. There was competent evidence in the record, based on plaintiff's testimony and her medical records, that plaintiff's August 24 and September 1 injuries left her with only a stiff neck and did not interfere with her ability to work. It was on 2 September 1998 that plaintiff experienced a stabbing pain in her neck and numbness in her arms. Plaintiff testified the pain was indescribable and reported to the emergency room with fears of suffering a heart attack. Dr. Brown testified at his deposition that the symptoms experienced by plaintiff (the sudden onset of pain, numbness, tingling in the musculature, and a mistaken belief of experiencing a heart attack) are consistent with symptoms experienced by people with a ruptured disc. Because these symptoms did not occur until plaintiff worked on her truck on September 2, Dr. Brown concluded that the work incident caused her injury.

Accordingly, there was sufficient expert medical testimony on the issue of causation justifying the Commission's findings and its ultimate conclusion of a work-related accident.

Affirmed.

Judges TIMMONS-GOODSON and ELMORE concur.